30 Cal.2d 215 (1947)
Estate of WILLARD E. KAY, an Incompetent Person. WILLARD E. KAY, an Incompetent Person, etc., Petitioner,
v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.
S. F. No. 17387. 
Supreme Court of California. In Bank. 
June 2, 1947.
 Henry J. Rogers and Elden C. Friel for Petitioner.
 Cushing & Cushing, Cullinan, Trowbridge & Gorrill and Fred Herrington for Respondents.
 TRAYNOR, J.
 In this certiorari proceeding, petitioner seeks annulment of an order of the probate court confirming the sale of his home property. The sale was made while petitioner *217 was incompetent, but he has been restored to capacity since the order of confirmation of sale. Before his commitment he used the property both as a home and as an office where he practiced as a physician.
 Petitioner's guardian sold the property under the authority of section 1530 of the Probate Code: "If ... it is for the advantage, benefit, and best interests of the estate or ward or of such members of his family as he is legally bound to support and maintain, his guardian may sell any of his real or personal property for any of such purposes, subject to authorization, confirmation or direction by the court as hereinafter provided."
 [1] A guardian's sale is not effective, however, until it is confirmed by the court. (Kier Corp. v. Treasure Oil Co., 57 Cal.App.2d 829, 842 [136 P.2d 59].) Probate Code, section 785 (see Prob. Code, 1534) provides that "Upon hearing the court must examine into the necessity for the sale, or the advantage, benefit and interest of the estate in having the sale made, and must examine the return and witnesses in relation to the sale; and if it appears to the court that good reason existed for the sale, that the sale was legally made and fairly conducted ... the court shall make an order confirming the sale and directing conveyances to be executed; otherwise it shall vacate the sale and direct another to be had, of which notice must be given and the sale in all respects conducted as if no previous sale had taken place. ..." The petition for confirmation of sale filed by petitioner's guardian recited that the sale was for his best interests and the court confirmed the sale on that ground.
 Petitioner, conceding that an order confirming the sale of a ward's property is not appealable (Guardianship of Reser, 57 Cal.App.2d 935, 936 [135 P.2d 709]; Prob. Code, 1630), now seeks annulment of the order on certiorari. His position is stated as follows: "[I]t seems well settled (and there appears to be no case holding to the contrary) that when a statute authorizes prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction and certiorari will lie to correct such excesses." (Rodman v. Superior Court, 13 Cal.2d 262, 269 [89 P.2d 109].) The probate court derives its procedure and jurisdiction from statutes and is empowered to confirm the sale of a ward's property only if one of the statutory grounds is present. Here there is no evidence to support the probate *218 court's finding that the sale was in petitioner's best interests, which was the alleged statutory ground for confirming the sale. The probate court therefore exceeded its jurisdiction and certiorari will lie to annul its order confirming the sale.
 We are unable to agree with petitioner's analysis of the issues presented by this case. The quotation from the Rodman case is not applicable to this situation. In the Rodman case the superior court applied cash bail to the defendant's fine instead of returning it to the bondsman as required by the Penal Code. In the opinion this court illustrated the meaning of the rule quoted above by citing cases in which a lower tribunal made an award larger than that permitted by statute or extended a litigant's time to plead for a period in excess of the time authorized by the code. (Rodman v. Superior Court, supra, at 269-270.) These acts were clearly in excess of the prescribed statutory authority. The present case is one in which the probate court made a finding and issued an order in strict conformity with its statutory grant of authority.
 According to Probate Code, section 1530, the decision to sell the ward's property must first be made by the guardian. The sale must then be presented to the probate court for confirmation. In the proceeding for confirmation, Probate Code, section 785, requires that the court shall confirm the sale, after hearing and examination, "if it appears to the court that good reason existed for the sale." [2] It is clear, therefore, that the determination whether there was sufficient evidence upon which to base the order lies within the discretion of the probate court. That determination is not reviewable on certiorari. (Howard v. Superior Court, 25 Cal.2d 784, 788 [154 P.2d 849].)
 In Abelleira v. District Court of Appeal, 17 Cal.2d 280 [109 P.2d 942, 132 A.L.R. 715], the rule stated in the Rodman case was shown to rest upon a broader principle. "Speaking generally, any acts which exceed the defined power of a court in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of stare decisis, are in excess of jurisdiction, in so far as that term is used to indicate that those acts may be restrained by prohibition or annulled on certiorari." (P. 921.) Before setting forth the foregoing principle, the opinion in the Abelleira case gave numerous examples of such excesses of *219 jurisdiction. In every case cited as illustrative, the lower tribunal had no power to proceed in the manner attempted. None of the cases was concerned with a situation where, as here, the court performed the very function and made the very finding that was intended by the statute. There is nothing in the Abelleira or Rodman cases, therefore, to suggest that certiorari will lie where the only excess of power complained of is the entering of an order unsupported by evidence.
 This court was confronted with substantially the same problem in Howard v. Superior Court, 25 Cal.2d 784 [154 P.2d 849]. In that case the probate court, acting under section 473 of the Code of Civil Procedure, vacated its previous order allowing fees for counsel. The order vacating the allowance was not appealable. The attorneys to whom the fees were allowed sought a writ of certiorari to annul the order vacating the allowance. They contended that the court could vacate an order under section 473 only on the prescribed statutory grounds and that a study of the record would show that the court actually vacated the order on another ground. Our opinion states: "The petitioners' claim as to lack of a sufficient affidavit of merits, inadequacy of the showing of mistake, etc., and insufficiency of the proposed objections to the allowance of fees, do not affect the jurisdiction of the court to act on the petition, but merely indicate the possibility of error in the exercise of that jurisdiction. The motion was made upon statutory grounds and, assuming that the trial court should have decided that the mistaken belief of the husband and his counsel was due to their negligent failure to ascertain the facts with reference thereto, the error can be reviewed only on appeal." (P. 788.)
 The opinion distinguished those cases annulling orders of trial courts where the orders were not made pursuant to any of the prescribed methods of procedure as defined by the Code of Civil Procedure. "Hence it should be clear that the factual situation of these cases is entirely different from a case where the court is asked to act on proper grounds and does so act, and the claimed error is that the court abused its discretion in finding that there was a mistake or excusable neglect, etc., warranting relief under section 473. In other words, if the court sets aside its final order on a ground not authorized or recognized by the statute, it may be acting in excess of its jurisdiction, but if it does so on a ground authorized *220 by the statute, the possible insufficiency of the evidence to support its action does not go to its jurisdiction, but is a basis for review on appeal. So long as there is some showing in support of the trial court's action, the quantum of proof cannot be weighed on certiorari." (P. 789.)
 Petitioner contends, nevertheless, that this court should search the record to determine whether there is evidence to support the order, on the ground that the probate court is a court of limited jurisdiction. His theory is that a reviewing court should treat the decrees and orders of the probate court as though they had issued from an administrative agency and thereby demand that there be some evidence to establish the "jurisdictional fact."
 It is not necessary here to determine whether or not the finding that the sale was in petitioner's best interests would constitute a "jurisdictional fact," as that phrase is used in administrative board cases. [3] The probate court is not an administrative tribunal in any sense of the term. Although the procedure and jurisdiction of the superior court sitting in probate are limited by the provisions of the Probate Code, and in that sense "limited and special" (Texas Co. v. Bank of America etc. Assn., 5 Cal.2d 35, 39 [53 P.2d 127]), that court is not an inferior tribunal of limited jurisdiction. In certain probate proceedings the superior court has only the power given it by the Probate Code and no more. (McPike v. Superior Court, 220 Cal. 254, 258 [30 P.2d 17].) This does not mean that the Legislature has created a new court. The Legislature has, in exactly the same manner, circumscribed the jurisdiction of the superior court in many of its other proceedings. Nevertheless it remains a court of general jurisdiction.
 The control by the Legislature over probate jurisdiction does not, therefore, lessen the dignity of decrees and orders of the superior court sitting on probate. "... the decrees of the probate court in matters, which like these, are clearly within its statutory grant of jurisdiction, have the same effect, and are supported by the same presumptions on collateral attack, as the judgments of a court of general jurisdiction." (Estate of Keet, 15 Cal.2d 328, 335 [100 P.2d 1045]; see, also, Marlenee v. Brown, 21 Cal.2d 668, 677 [134 P.2d 770]; Texas Co. v. Bank of America etc. Assn., supra, at 41; Burris v. Kennedy, 108 Cal. 331, 336 [41 P. 458]; Wood v. Roach, 125 Cal.App. 631, 635 [14 P.2d 170].) Even though the *221 probate court exercises a particular statutory jurisdiction, it has many incidental powers in pursuance thereof. (See Bennett v. Forrest, 24 Cal.2d 485, 491- 492 [150 P.2d 416]; Dobbins v. Title Guar. & Trust Co., 22 Cal.2d 64, 67-69 [136 P.2d 572].) The orders and decrees of the probate court are treated with the same dignity on appeal as any other orders and judgments of the superior courts. (Estate of Caspar, 172 Cal. 147, 149 [155 P. 631]; Estate of Snowball, 157 Cal. 301, 305 [107 P. 598].) A fortiori they receive equal treatment on certiorari. (Howard v. Superior Court, 25 Cal.2d 784, 788 [154 P.2d 849]; Lilienkamp v. Superior Court, 14 Cal.2d 293, 301 [93 P.2d 1008]; Heydenfeldt v. Superior Court, 117 Cal. 348, 351 [49 P. 210].)
 [4] Although we have found it unnecessary to look to the record for evidence in support of the probate court's finding, the writ of certiorari has already issued and we have the record before us. It is at once apparent, upon examining that record, that the court did not enter its order without evidentiary basis. In fact, even if an appeal were possible in this case it is doubtful whether we could, under the holding of this court governing the scope of review of decisions based upon conflicting evidence, reverse the order.
 Petitioner was committed to Napa State Hospital in January, 1946, and transferred to the United States Veterans Administration Facility in Palo Alto in March, 1946. His wife had previously been committed to a mental hospital in 1940. The Anglo California Bank was appointed guardian of the estates of both incompetents and, in April, 1946, sold the home they owned in joint tenancy for $40,400. The petition for confirmation of the sale was filed on April 15, 1946. The hearing on the confirmation began on May 3, 1946, but two continuances were granted in order to afford petitioner an opportunity to appear with counsel and present his objections to the sale.
 M. L. Glover, acting assistant trust officer of the bank, was examined on behalf of the guardian. He testified, in part, as follows: "Q. Do you believe it to be to the advantage and best interests of Dr. Kay's estate, and Dr. Kay, that the property be sold? A. We do." This testimony was later substantially repeated: "Q. As representative of the Bank, representing the Bank, they feel that the property should be sold, that it is to the best interests of the estate, and of the incompetent? A. Yes." Glover was also questioned *222 with regard to the interest of petitioner's wife: "Q. You believe it to the best interest of the incompetent and her estate that the property be sold? A. Yes."
 Glover admitted on cross-examination that no effort had been made to lease the property, although it could readily have been leased. He stated also that the bank had not made inquiries of the hospital staff in order to ascertain petitioner's condition before selling the property. In fact, the hospital staff had determined preliminarily on March 22d that petitioner was sane and competent. Further consultations were necessary, however, and he was not discharged as sane and competent until May 13th, after the hearing on confirmation of sale had begun. Glover also testified that petitioner had about eight or ten thousand dollars in securities in addition to disability payments from an insurance policy, but that these payments would cease upon petitioner's recovery. According to Glover, the accepted bid constituted the highest price obtainable for the property.
 Petitioner produced two medical witnesses, one of them from the hospital at Palo Alto. The latter testified that petitioner was sane and competent and had been given a certificate by the hospital to that effect. He was of the opinion that all sane men are competent, thus demonstrating unfamiliarity with the legal distinction between competency and sanity (Prob. Code, 1460), but he stated definitely that the hospital staff had determined that petitioner was not only sane but competent to handle business affairs.
 The other medical witness was also of the opinion that petioner was sane and competent but his opinion was qualified: "Q. And what is your opinion___ A. I believe that he could go back to work and take care of himself and his property, if he doesn't go too fast and too hard. Q. Do you think that his condition is such--in other words, would he be able, in your opinion, to return to active practice today? A. Today--not today, right away--I would advise that he take quite a few months further rest before going into practice. Q. At the present time, as of today, you would say that he is not able___ A. He might be able to get by with it, but I would think it better for him to go slowly. Q. And you think that he is able today to handle his business affairs, his money, his insurance, stocks and bonds, and things of that sort? A. That is something I would hesitate to say, because I don't know enough about those things--a man might *223 be quite capable of doing one thing, and his judgment might not be good in business matters. Q. Might it impede his further recovery if he were to be saddled down now with financial matters, financial worries--on the stock market, for example, and the matter of handling money? A. That would add to his difficulties."
 The witness had testified earlier that the sale of petitioner's home would be detrimental to him, but this opinion was also qualified on cross- examination: "Q. I will ask you if you read this part of the Veterans Bureau report--on the history of the case--these excerpts were, about the neighbors sending messages to the District Attorney's office relative to peculiar actions--visiting homes of neighbors throughout all hours of the night--ringing doorbells--making inquiry about property--all nine rooms of his home being strewn with papers, decayed food lying all about the kitchen--I call your attention to those portions of the report; you read that before you testified? A. I did. Dr. Kay [interrupting]: That is not true sir. ... Q. When you testified on Mr. Lang's [petitioner's attorney] question concerning the effect it would have on Dr. Kay in not moving back into this same house, did you have in mind then the facts of the case concerning the neighbors' actions at the time referred to? A. I was not thinking of them particularly; I merely felt this: that any man who was moved out of his house these days, and had difficulty getting another one, would not be affected favorably thereby--how much effect it would have on him, or how much it would do to him, I couldn't say. Q. In other words, you would say the same of any person? A. I would say the same about anybody. Q. Sane or insane, competent or incompetent? A. Yes."
 The trial court, after hearing the evidence and the arguments on behalf of petitioner, the guardian, and the purchaser, ordered confirmation of the sale. Subsequent to the order of confirmation, on June 7, 1946, petitioner was restored to capacity by an order of another department of the superior court.
 It is clear even from the foregoing account of the record that the probate court had some evidence upon which to base its finding that the sale was for the best interests of petitioner. The evidence shows that a good price, the best obtainable, was bid for the house and that petitioner's finances are not so secure that the court could be certain of his ability *224 to maintain a large house after his insurance disability payments cease, particularly in view of the medical testimony. Petitioner had between eight and ten thousand dollars in stocks and his income consisted primarily of insurance disability payments. The evidence also showed that the neighborhood was unfriendly to petitioner. The court may reasonably have concluded that his return to this neighborhood would be inimical to his best interests.
 The probate court was also fully aware that even if the sale of petitioner's share of the property were vacated, the purchaser might remain the owner of his wife's joint interest. In that event petitioner would not be entitled to exclusive possession of the property but would be a tenant in common with a stranger. The representative of the bank, Glover, testified that the sale of the wife's share of the property was for her best interests and there is no contest over the order of the probate court confirming the sale of her interest.
 [5] Finally, the representative of the guardian stated that he considered the sale to be for petitioner's best interests. Whether or not an objection to this opinion, if made at the hearing, would have to be sustained (see 7 Wigmore on Evidence, 1960), it is clear that in the absence of any objection by petitioner, the opinion was properly considered by the court. (Powers v. Board of Public Works, 216 Cal. 546, 552 [15 P.2d 156]; Parsons v. Easton, 184 Cal. 764, 769 [195 P. 419]; Williams v. Hawley, 144 Cal. 97, 102 [77 P. 762]; Abbott v. Limited Mut. Comp. Ins. Co., 30 Cal.App.2d 157, 163 [85 P.2d 961].)
 [6] Petitioner contends that this opinion is worthless because he later recalled Glover to the stand and asked: "Q. Did you have any reason to make any investigation at that time? Had anyone informed you that Dr. Kay had made any application for restoration? A. No. If there had been, we would have made no effort to sell the property." Petitioner interprets this testimony as an admission that the sale was not for his best interests and that the guardian would not have made the sale had it been advised that petitioner would soon be discharged from the institution. This testimony is open to another interpretation, however, consistent with the guardian's position that the sale was for petitioner's best interests. If a petition for restoration to capacity has been filed, a guardian in all likelihood would hold in abeyance *225 any plans to sell the property. He would have to envisage the possibility that a judgment of restoration to capacity, with accompanying revocation of letters of guardianship and order to restore the estate of the ward, might follow before the sale could be confirmed. If a contrary judgment were made, it might serve to confirm his conclusion that a sale would be for the best interests of the ward. The probate court could reasonably construe Glover's statement as a declaration that negotiations for sale would not be initiated if application was made for restoration to capacity. The petition for restoration was not filed until the day that Glover testified in the hearing for confirmation of the sale. His opinion that the sale was for petitioner's best interests, therefore, is not necessarily altered by his later statement that he would not have made an effort to sell the property after the filing of a petition for restoration.
 [7] Petitioner finally contends that since he was on the verge of restoration to capacity at the time of the confirmation, the court should have granted him another continuance until after the hearing and determination of the petition for restoration. But the probate court could not assume, from the discharge and subsequent petition for restoration, that petitioner was sane and capable of taking care of himself and his property. The discharge acts as a restoration to capacity only where no guardian has been appointed. (Welf. & Inst. Code, 6729.) [8] In petitioner's case a guardian had been appointed and he could be restored to capacity only by the procedure under section 1470 of the Probate Code. (In re des Granges, 102 Cal.App. 592, 599 [283 P. 103]; see Vigne v. Superior Court, 37 Cal.App.2d 346, 352 [99 P.2d 589].) His petition for restoration was subject to contest (Prob. Code, 1472), and the court before which the petition was brought could have denied restoration to capacity upon proper grounds irrespective of the discharge. (Guardianship of Gordon, 56 Cal.App.2d 523, 527 [132 P.2d 824].)
 [9] Although the probate court might have granted petitioner a continuance, the propriety of its failure to do so cannot be raised in this proceeding. Petitioner was granted two continuances in order to allow him an opportunity to be present with counsel and to prepare his objections to the confirmation. The trial court, of course, has a wide discretion in granting or denying continuances, and its decision is *226 not even disturbed on appeal, unless a clear abuse of discretion is shown. (Marcucci v. Vowinckel, 164 Cal. 693, 695 [130 P. 430].) [10] It need hardly be added that on certiorari we do not review matters within the discretion of the lower court. (Spanach v. Superior Court, 4 Cal.2d 447, 450 [50 P.2d 444].)
 A ward's inability to appeal from an order confirming the sale of his property does not, however, leave him wholly without a remedy. The relationship of guardian and ward is a highly fiduciary one. The conduct of a guardian is carefully regulated both by statute and case law. (Prob. Code, 1400.) Were the guardian as derelict in its custodianship of petitioner's estate as petitioner contends, it could be held to account in a proper proceeding brought on behalf of the ward. Were there collusion between the guardian and the purchaser, though there is no inkling of it in the record, petitioner could seek redress through an action to impose a constructive trust on his property. (See Restatement, Restitution, 201.)
 The order is affirmed.
 Gibson, C.J., Edmonds, J., and Spence, J., concurred.
 CARTER, J.
 I concur in the judgment of affirmance, and I am in full accord with the views expressed in the opinion prepared by Mr. Justice Traynor.
 In view of the showing made in the trial court I cannot see how it can possibly be said that the trial judge did not have sufficient evidence before him to justify his conclusion that the sale in question was for the best interests of the incompetent ward in this case. It is not the function of an appellate court to weigh the evidence or to pass upon the reasonableness of conflicting inferences which may be drawn from the evidence even if that evidence is undisputed. Under our system of jurisprudence the weighing of the evidence and the determination of the effect of the inferences to be drawn therefrom is solely for the trier of fact (Estate of Bristol, 23 Cal.2d 221 [143 P.2d 689]; Eagles v. Samuels, 329 U.S. 304 [67 S.Ct. 313, 91 L.Ed. ___]; Tennant v. Peoria & P.U.R. Co., 321 U.S. 29 [64 S.Ct. 409, 88 L.Ed. 520]; Ellis v. Union Pacific Ry. Co., 329 U.S. 649 [67 S.Ct. 598, 91 L.Ed. ___]; National Labor Relations Bd. v. Hearst Publications, 322 U.S. 111 [64 S.Ct. 851, 88 L.Ed. 1170]; Commissioner v. Scottish Amer. Co., 323 U.S. 119 [65 S.Ct. 169, *227 89 L.Ed. 113]; Unemployment Compensation Commission v. Aragan, 329 U.S. 143 [67 S.Ct. 245, 91 L.Ed. ___]; Cardillo v. Liberty Mut. Ins. Co., ___ U.S. ___ [67 S.Ct. 801, 91 L.Ed. ___]).
 The rules governing an appellate court in reviewing the decision of a trial court in probate as well as other civil cases are admirably stated by Mr. Justice Schauer in Estate of Bristol, 23 Cal.2d 221 [143 P.2d 689], as follows:
 "The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. (Estate of Snowball (1910), 157 Cal. 301, 305 [107 P. 598]; Estate of Barr (1924), 69 Cal.App. 16, 33 [230 P. 181].) [2] The rule as to our province is: 'In reviewing the evidence ... all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary ... principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (Italics added.) (Crawford v. Southern Pacific Co. (1935), 3 Cal.2d 427, 429 [45 P.2d 183].) The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict. The critical word in the definition is 'substantial'; it is a door which can lead as readily to abuse as to practical or enlightened justice. [3] It is common knowledge among judges and lawyers that many cases are determined to the entire satisfaction of trial judges or juries, on their factual issues, by evidence which is overwhelming in its persuasiveness but which may appear relatively unsubstantial--if it can be reflected at all--in a phonographic record. Appellate courts, therefore, if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical. Upon such view of the law we cannot hold that any essential finding in this case is unsupported." [Emphasis added.] *228
 I am in full accord with the views expressed in the foregoing excerpt. These views were again restated by Mr. Justice Schauer with exceptional force and clarity in his dissenting opinion in the case of Isenberg v. California Emp. Stab. Com., ante, p. 34 at page 46 [180 P.2d 11], where he said: "The functions of trial and appellate courts are constitutionally disparate and no rule should be more scrupulously observed by courts of appeal than that in their appellate work they should not encroach upon or usurp a trial court function. The resolution of factual questions including the determination of the inferences to be drawn from the evidence whether that evidence be documentary or undisputed or otherwise, is in a major sense exclusively the province of the trial court (or of the jury). It is exclusive in the trial court (or jury) in the sense that the appellate court is given no right to resolve factual conflicts or to indulge its preference as to the selection of inferences from the evidence. It is only where clearly there is no substantial evidence from which essential inferences can be drawn that the appellate court may properly interfere in a factual sense; and its interference then should be both in form and in substance by a statement of the law not a declaration of fact. Any other course by an appellate court is dictatorial in nature and tends toward depriving litigants of the constitutional standards of a fair trial."
 In the light of the foregoing pronouncements as to the function of an appellate court in reviewing a factual determination by a trial court there can be no escape from the conclusion reached in the majority opinion.
 SCHAUER, J.,
 Dissenting.
 "To thus interpret law doth cuckold justice." The "dim and odious annals of the past" (Lytton Strachey, Elizabeth and Essex) are, indeed, come down to date. Is an adult man who is sane and competent in fact, who has served his country as well as his community as a physician and surgeon, who is convicted of no crime, who owes no debts, who has thousands of dollars of cash in the hands of a bank which had been appointed his guardian, who owns a house which he built on a lot which he bought with funds which he earned, who is possessed of ample income, who needs and wishes to keep the house to use as an office for his practice and as a home for himself and his two young daughters, but who at one time was mentally ill for *229 67 days, who, it is res judicata, had recovered and was "sane and competent" at the time of the court order here involved, helpless to prevent a sale by his "guardian" of his property? To the shame of our system of jurisprudence the majority of this court so hold.
 Dr. Willard E. Kay, a physician and surgeon, the husband of Nancy Kay and the father of Nancy Ann and Kathryn, who has honorably ministered in the armed forces as well as in his civilian community, about ten years ago built a house at the northwest corner of Scott and Broadway in San Francisco. He built it for himself and his wife Nancy and their two young daughters. Nancy became incompetent several years ago. Dr. Kay used the house both as family residence and professional office. On January 14, 1946, he was adjudged mentally ill and was committed to the Napa Hospital. On January 22, 1946, the Anglo California National Bank of San Francisco was appointed guardian of his estate. (It also, previously, had been appointed to act as guardian of Nancy's estate.) Fifty-nine days later, on March 22, 1946, the staff of the Veterans Administration Hospital to which institution Dr. Kay had been transferred on March 20, 1946, examined him and found him "sane and competent." This is not disputed. He was, nevertheless, temporarily retained under examination. On April 6, 1946, Dr. Kay was again "presented ... to the staff and at that time he was also considered sane and competent; there was another case review on May 1st, 1946 ... at which he was also considered competent, and the last review was on the 13th of May, at which time he was discharged from the hospital as sane and competent." He was at that time (May 13, 1946) "Discharged to his own custody" to take care of his own affairs and was given a formal certificate of competency as provided for by statute. (Welf. & Inst. Code, 6729.)
 Prior to May 16, 1946, Dr Kay filed his petition for legal restoration to adjudicated competency. He alleged among other things that "Ever since May 1, 1946, petitioner has been, and he now is sane, and competent and of sound mind, and is entitled to be restored to mental competency and capacity, and ever since said date, he has been, and now is, fully capable of caring for himself and of managing his affairs and his estate, and is entitled to an adjudication to that effect." On June 7, 1946, all the above allegations were *230 adjudicated to be true. Not one allegation in that petition was challenged by Dr. Kay's guardian, by the trial judge, by Mr. Edel Epstein who had a deal pending with the guardian to purchase Dr. Kay's property at private sale, or by anyone else. Nevertheless, with that petition pending hearing, the trial court undertook, on May 16, 1946, to confirm (apparently the trial judge believed that he was merely refusing to "set aside") a sale of Dr. Kay's property, over his protests, to Mr. Epstein. The sale was confirmed for a price of $20,200 for Dr. Kay's interest ($40,400 for the entire property); the property had previously, by the court appraiser, been appraised at $25,000 for Dr. Kay's interest ($50,000 for the entire property). The property had not been offered publicly or listed with any broker. It was offered by the guardian at private sale to Mr. Epstein and the guardian undertook to make the sale to Mr. Epstein for $40,400 while the property stood appraised at $50,000. That sale was undertaken by the guardian (petition for confirmation filed) on April 15, 1946. It will be remembered that according to the undisputed evidence Dr. Kay, in the opinion of the Veterans Administration Hospital staff, had recovered and was "sane and competent" as early as March 22, 1946, more than three weeks before the guardian even filed the petition for confirmation and nearly two months before the "confirmation." The excuse stated by the guardian for offering to sell under the circumstances shown was that it did not know that Dr. Kay had recovered. Its representative admitted that no effort had been made to ascertain his condition. Nevertheless, on May 16, 1946, assertedly under the mistaken belief that the property had already been sold and that it did not have the right "to set aside the sale," the trial (probate) judge confirmed the sale. This egregious error and failure to pursue jurisdiction, the majority hold, cannot be rectified.
 None of the essential facts are disputed. This is not a case wherein, there being a conflict in the testimony or in the inferences to be drawn from the testimony or documents or circumstances shown, it is the duty of the reviewing court to sustain the inferences and conclusions of the trial court. The holding in Estate of Bristol (1943), 23 Cal.2d 221, 223 [143 P.2d 689], inferentially relied upon, although not cited, in the majority opinion, has no pertinency here. That case deals with a question as to the sufficiency of evidence; here *231 we are confronted not merely with a paucity of evidence to support a finding which was made but, more particularly, with an overwhelming, undisputed, affirmative showing that the act of the probate court exceeded its "defined power" as "defined by ... express statutory declaration." (Abelleira v. District Court of Appeal (1941), 17 Cal.2d 280, 291 [109 P.2d 942, 132 A.L.R. 715].) It has frequently been held, in substance, that if from all the facts only a single inference and one conclusion may be drawn, then such single inference becomes a fact in the case and the "one conclusion" must be drawn as a matter of law. (Baugh v. Rogers (1944), 24 Cal.2d 200, 206 [148 P.2d 633, 152 A.L.R. 1043]; Perguica v. Industrial Acc. Com. (1947), 29 Cal.2d 857, 859 [179 P.2d 812]; Fields v. Sanders (1947), 29 Cal.2d 834, 842-843 [180 P.2d 684]. Justice Traynor, on another occasion (Mosley v. Arden Farms Co. (1945), 26 Cal.2d 213 [157 P.2d 372, 158 A.L.R. 872], concurring opinion, p. 223) stated his view to be that "[I]f reasonable men could not differ as to whether the evidence does or does not establish the existence of a fact, the court will not submit the issue to the jury.") Here, all the essential facts are either undisputed or are res judicata. Only one conclusion in respect to departure from jurisdictional procedure can be drawn by a reasonable mind. If the same rule of law which was followed in the Abelleira case is applied here the order rendered must be annulled.
 It is undisputed that there was no necessity for the sale. Dr. Kay was at all times concerned in receipt of a cash income of some $500 or $600 a month from insurance policies and it was not disputed that such income would continue as long as he remained unable to carry on his practice. He had thousands of dollars of cash on hand. It is also undisputed that he was possessed of some $8,000 to $15,000 worth of readily marketable securities. No cash was needed in the estate and the personal property securities were not offered for sale. The real property was never offered for rent; the guardian held it vacant.
 Dr. Kay was incompetent for but a few weeks, or at most, even in a legalistic sense, months. As previously noted the guardian was appointed on or about January 22, 1946. On March 22, 1946, Dr. Kay was pronounced sane and competent by the hospital staff; on May 13, he was discharged and given his formal certificate of competency; and on June 7, it was formally adjudged that he was then, and at all times *232 subsequent to May 1, 1946, had been, "sane, competent and of sound mind and ... entitled to be restored to mental competency and ever since said date, he has been, and now is, fully capable ... of managing his affairs and his estate."
 In apparent haste to sell Dr. Kay's property before he was fully restored to legal competency, the petition for confirmation was filed April 15, 1946, without consulting him and without inquiry as to his then condition of health. The petition alleges, among other things, that "the interest of this estate in said parcel has been appraised at $25,000.00, but your petitioner is informed and believes, and therefore alleges, that said appraisement is too high, and therefore respectfully requests that a new appraisement be forthwith had. (6) That said sale was made directly with said purchaser [Edel R. Epstein] without the employment or assistance of any broker or agent and no real estate broker's commission is payable." Such petition was set for hearing on May 3, 1946. This was some six weeks after Dr. Kay had been found sane and competent by the staff at the Veterans Administration Hospital but while he was still under observation there. On that day a telegram which had been received by the clerk of the court on the preceding day, was called to the attention of the trial judge. The telegram purported to come from the brother-in-law of Dr. Kay and read as follows: "Dr. Kay's home is not to be sold or sale confirmed in court without his personal consent. Arrangements were made for his release on May 1st from Veterans Hospital. Mrs. Kay may arrive May 2nd. Dr. Kay's condition was only temporary and not permanent and is well now. They must be allowed to occupy the house and sale must not be confirmed until and unless Dr. Kay consents to it. Meanwhile confirmation can be continued two or three weeks or a month." The trial judge remarked, "I really see no reason why this matter should be postponed. I can't pay any attention to telegrams from somebody that knows nothing about the circumstances, or from relatives. ... We cannot be postponing these sales for trivial matters ... I understand Dr. Kay was--before Dr. Kay was committed, the whole neighborhood was out hiring attorneys--he was firing shots through the ceiling--isn't that true? [The record before us is devoid of evidence to this effect.] ... This incompetency has been going on for a long time, hasn't it?" "Mr. Herrington: Not Dr. Kay--it is only three or four months old." "The Court: *233 Well, that is some time. ..." The matter was, however, continued until May 10, and at that time Dr. Kay and his counsel appeared and opposed the confirmation of sale. Among other things stated to the court the following appears: "Dr. Kay, who is one of the incompetents here, is in court, as your Honor said. We have been informed by the medical staff, or by a member of the medical staff, of the Veterans Administration Hospital in Palo Alto, that Dr. Kay should be restored, and that he is no longer incompetent, and that preceedings should be commenced for the purpose of having his competency adjudicated, and having him restored."
 "We are asking on behalf of Dr. Kay for a continuance in this matter, and that the sale either not be confirmed or that it be continued for a sufficient period of time to enable this incompetent to have an opportunity to be restored. [Italics added.] The reason this request is made is because this is his home, and he has no place to go and live and have his office, since he is a practicing physician--he was before he was adjudicated an incompetent--and he asks the Court to continue the matter, or to disapprove the sale for that reason. We believe that it is within the Court's discretion to do that, to enable him to save his home. Legally, he is incompetent and insane today, but in a few days, from the information that we have, he will be declared competent. ..."
 "The Court: ... I think the only thing I can do, to preserve the rights of Mr. Cullinan and his clients [the Epsteins]--after all, they have some rights--this sale is legitimate, in spite of the natural sentiment we have about taking a home from somebody. I think a few days' continuance should be granted. ... And I want a substantial showing at that time--I don't want to hear what is going to be done, and all that; I want some substantial showing at that time." (Italics added.) There is in the record not the slightest basis for holding that either the prospective purchasers or their attorney had any "rights" in the premises to be "preserved." It was Dr. Kay and his wife, Nancy, who had rights which should have been the primary concern of the court and the guardian.
 On May 16, the hearing resumed. At that time it appeared that not only had Dr. Kay been released from the hospital as restored to sanity and competency in the opinion of the medical staff, but that he had filed a petition for restoration by the court to full legal competency and that hearing on *234 such petition had been set for June 6, only some three weeks away. The petition averred that petitioner was in fact sane and competent as of the date of its filing and that he had been sane and competent "ever since May 1, 1946." As previously noted none of its allegations was challenged by anyone and on June 7, they were adjudicated true.
 The evidence upon which the majority rely to support the jurisdiction of the trial court in its purported confirmation of the sale--actually, its denial of rescission--is that of one Myron L. Glover, an employee of the trust department of the guardian bank. In response to leading questions he undertook to state the naked belief and feeling, not his personal opinion, of his corporate employer as to the advantage to Dr. Kay and his estate of making the sale in question. He gave no reason, whatsoever, for the "belief" or "feeling" of the bank except the indicated basic belief that Dr. Kay was insane and incompetent and would remain so indefinitely. The transcript shows: "Q. Do you believe it to be to the advantage and best interest of Dr. Kay's estate, and Dr. Kay, that the property be sold? A. We do. ... Q. As representative of the Bank, representing the Bank, they feel that the property should be sold, that it is to the best interest of the estate, and of the incompetent? A. Yes. ... Q. (Mr. Lang) I will ask you if you made any investigation or caused any investigation to be made as to the possible recovery of Dr. Kay on or before April 15, 1946 [the date the petition for confirmation was filed]? ... A. No. Q. Did you have any reason to make any investigation at that time? Had anyone informed you that Dr. Kay had made any application for restoration? A. No. If there had been, we would have made no effort to sell the property. Q. You did not know that he was found to be sane and competent by the medical staff on March 22? ... A. No, we had no knowledge." (Italics added.)
 It is thus obvious that the "belief" of the bank clerk as to the "feeling" of the bank was based on the further erroneous belief that Dr. Kay continued insane and incompetent when in fact he had recovered. The attitude of the bank on the final hearing (May 16, 1946) in relation to the question of Dr. Kay's restoration to legal competency, is reflected by the following passage from the transcript: "[By Mr. Herrington.] Mr. Cullinan is here representing the purchasers, and Mr. Lang is also here, and I think your Honor has the picture in mind from last week. As far as the petition for *235 restoration, I might say that the Bank's position on that is neutral; if the doctor can establish that he has recovered and is entitled to handle his own affairs, the Bank will be only too happy to cooperate and abide by any order the Court may make in that connection. We do not expect to oppose that at all." (Italics added.) But the effort to confirm the sale went on.
 Evidence was introduced which, without any substantial dispute, established that Dr. Kay had in fact largely recovered his health and strength, that he was then sane and competent but should avoid overworking and worry for some months. It was undisputed that he had been released, as restored to sanity and competency, to return to his own home, that he was able to resume to some extent his practice of medicine, and that he needed and wanted his home place in which to reside and maintain his family and his office. The property had been kept vacant during the months that Dr. Kay had been in the hospital and, upon Dr. Kay's recovery and restoration, his guardian refused to allow him to enter it.
 It is to be remembered that we are here concerned with a guardianship matter and with the limited power of the court, sitting in probate, in a special statutory proceeding. No case in modern legal literature, in California or elsewhere, which indulges hyper-technicality to a similar end and to the extent of the majority opinion in this case, has been cited. Section 785 (Prob. Code) declares that "Upon the hearing the court must examine into the necessity for the sale, or the advantage, benefit and interest of the estate in having the sale made, and must examine the return and witnesses in relation to the sale. ..." (Italics added.) In Abelleira v. District Court of Appeal (1941), supra, 17 Cal.2d 280, 291, this court said: "The concept of jurisdiction embraces a large number of ideas of similar character, some fundamental to the nature of any judicial system, some derived from the requirement of due process, some determined by the constitutional or statutory structure of a particular court, and some based upon mere procedural rules originally devised for convenience and efficiency, and by precedent made mandatory and jurisdictional. Speaking generally, any acts which exceed the defined power of a court in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of stare decisis, are in excess of jurisdiction, in so far as that term is used to *236 indicate that those acts may be restrained by prohibition or annulled on certiorari."
 It is Hornbrook law that the jurisdiction of a probate court, as such, is limited and special. (Olcese v. Superior Court, (1930), 210 Cal. 556, 568 [292 P. 964]; Haynes v. Meeks (1862), 20 Cal. 288, 312, 314; Janes v. Throckmorton (1881), 57 Cal. 368, 387; 21 Am.Jur. 582, p 709. See, also, Estate of Davis (1902), 136 Cal. 590, 597 [69 P. 412]; McPike v. Superior Court (1934), 220 Cal. 354, 258 [30 P.2d 17]; Texas Co. v. Bank of America (1935), 5 Cal.2d 35, 39 [53 P.2d 127].) In Rodman v. Superior Court (1939), 13 Cal.2d 262, at 269 [89 P.2d 109], this court said: "An examination of the numerous cases which deal with this problem impels the conclusion that some confusion exists with reference to what constitutes an excess, and what constitutes an error, in the exercise of jurisdiction. However, it seems well settled (and there appears to be no case holding to the contrary) that when a statute authorizes prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction, and certiorari will lie to correct such excess." See, also, Spreckels S. Co. v. Industrial Acc. Com. (1921), 186 Cal. 256, 260 [199 P. 8]. There is no appeal, in a guardianship proceeding, from an order confirming a sale of property. (Guardianship of Reser (1943), 57 Cal.App.2d 935, 936 [135 P.2d 709].)
 The trial court, seeming to be of the view that the purchaser acquired vested rights as of the date of his bid and that those "rights" must prevail unless and until Dr. Kay proved some "grounds" for rescinding or "setting aside the sale," placed the burden on Dr. Kay to prove grounds for "setting aside the sale," rather than on the guardian or Mr. Epstein to prove existence of jurisdictional facts necessary to warrant confirming the projected sale. The court further held that the recovery of sanity and competency by Dr. Kay was not a sufficient ground for "setting aside the sale," that the sale could not be set aside or confirmation withheld "for the grounds that we have heard here today" and concluded the hearing with these words: "I think the showing here is absolutely insufficient. I have heard all this evidence here today just to accommodate those who came here, and to give everyone a hearing--I do not think it affects the issues of the case at all. The order is that this sale is confirmed." (Italics added.)
 Regardless, therefore, of the sufficiency of the evidence otherwise to show jurisdiction to confirm the sale, it unmistakably *237 appears that the probate court in ordering that "this sale is confirmed" was not actually complying, in any sense, with section 785 of the Probate Code but was holding merely that as a matter of law the recovery of Dr. Kay was insufficient to constitute, and wholly immaterial as, a ground for "setting aside" the sale which, in its conception, had already been made by the guardian to Mr. Epstein. As repeatedly indicated by the trial judge he was concerning himself not with a diligent inquiry into the best interests of Dr. Kay and his estate, as the statute requires, but rather with protecting the "rights" of those whom he considered already to be purchasers. He said, "I think the only thing I can do, to preserve the rights of Mr. Cullinan and his clients [Mr. and Mrs. Epstein]--after all, they have some rights--this sale is legitimate, in spite of the natural sentiment we have about taking a home from somebody. I think a few days' continuance could be granted; and ... I don't want any of these certificates that I get here, they are of very little weight. Where anybody is likely to be deprived of his rights, that is the position that this court is going to take. ... Mr. Herrington: Does your Honor care to appoint doctors? The Court: There is nothing before the court now. This is a case where both of these parties were committed. ... At the time this was submitted for sale was there any question then about his petition for recovery here? ..." (Italics added.)
 The bank representative then testified that at the time the property was offered by the bank to Mr. Epstein, the bank did not know that Dr. Kay had recovered his reason. The following then appears: "Q. [by Mr. Lang] I will ask you if you made any investigation or caused any investigation to be made as to the possible recovery of Dr. Kay on or before April 15, 1946? Mr. Herrington: I will object to the question on the ground___ The Court: Do you think that it is the duty of the Bank--before confirmation of a sale--that they should go--when a man is in some institution, and has been regularly committed--that it is the duty of any bank to go, before property is offered for sale, and find out whether there is a possibility that this man may be restored to competency; is that your question? Mr. Lang: Yes, your Honor, in view of the fact that it is home and his castle. The Court: That is not the point at all here--I do not want any of this sentiment in this case about a man's home being his castle--we had all that up here before. Let us get down to the legal points. ... I am giving a great deal of time to *238 this case--this type of testimony would be appropriate on an application for restoration, which is not before the Court at all at this time [it was filed and pending, awaiting hearing], but I did not want these doctors to come up here without hearing them. Of course, they have not impressed me that much on the issue here, which is the question of this confirmation of sale--that is the issue. Mr. Lang: The whole question is whether the sale would be detrimental--I intimated or suggested that it would seem to me the fair thing to do would be to lease this property out. The Court: What about all the legal steps that have been taken here? The sale was advertised; the bids were received; the Court called for further bids--all of those things have been done. I just went out of my way to do what I suppose I had no authority to do, over Mr. Cullinan's objection here, to go into this matter; and upon your personal request to me the other day--you told me you had been retained in the case; but whether those things affect the issue here is another question. ... Mr. Herrington: ... The question seems to be: is this sale, as it now stands, for the advantage, benefit, and best interest of Dr. Kay? Mr. Lang: That is the whole question. It has been my procedure, or at least it has been the custom of myself and the Bank of America or the Anglo California Bank--I can't say the Anglo California--to make an investigation before going into a matter like this. The Court: I never heard of such a custom. ... Mr. Cullinan: There is not much for me to say in addition to what I have already said at previous hearings--this is a difficult time for purchasers to find places, and when they find a place and put a lot of money and obligate themselves for the title search and make arrangements for contractors, painters, and other trades to fix the place up___Mr. Lang: You know, Mr. Cullinan, don't you, that all sales are subject to the confirmation of the Court? The Court: But not for the grounds that we have heard here today. ... I think the showing here is absolutely insufficient. I have heard all this evidence here today just to accommodate those who came here, and to give everyone a hearing--I do not think it affects the issues of the case at all. The order is that this sale is confirmed." (Italics added.)
 It is manifest from the record hereinabove quoted that the trial judge did not comply with the procedure prescribed by section 785 of the Probate Code and that he wholly ignored *239 section 40 of the Civil Code. [fn. *] He made no pretense of examining "into the necessity for the sale, or the advantage, benefit and interest of the estate in having the sale made" in relation to the interest of Dr. Kay as a living competent person, or in relation to the "sale" as a mere contemplated or proposed, rather than a consummated project. He considered that the sale had already been made; that the purchaser had "rights" which it was the court's duty to "preserve"; that the proceeding was one whereby Dr. Kay sought to "set aside" the sale; and that he was passing on the legal sufficiency of grounds for "setting aside the sale." He held those grounds insufficient as a matter of law to "set aside the sale"; he did not comply with section 785 of the Probate Code, and the order sought to be annulled is not in actuality an order which the court in this proceeding had jurisdiction to make. It is unmistakably an order denying rescission of what the court denominated a "legitimate" sale.
 Of course, under our procedure a sale is not made until it is confirmed. (Estate of Rule (1944), 25 Cal.2d 1, 10 [152 P.2d 1003, 155 A.L.R. 1319].) Mr. Epstein had not bought Dr. Kay's property; he had merely offered to buy it. The court did not have before it, and did not have jurisdiction to pass upon, any issue as to rescission or "setting aside" of an otherwise binding sale. Yet it did not assume to pass upon any other issue. (Whether mandate should issue, upon proper application, to require the court to exercise the jurisdiction given it by section 785 of the Probate Code, is not now before us.) It is obvious that the court did not follow the procedure prescribed by section 785 of the Probate Code; that it entered no order whatsoever based on that procedure; i.e., on a settlement of issues projected by that statute; and that the order it did enter, by which it undertook to deny a rescission or "setting aside" of what it erroneously conceived to be an accomplished sale, is wholly void. As such, it should be annulled. *240
NOTES
[fn. *] *. Section 40 of the Civil Code provides that "After his incapacity has been judicially determined, a person of unsound mind can make no conveyance or other contract ... until his restoration to capacity. But a certificate from the medical superintendent or resident physician of the insane asylum to which such person may have been committed, showing that such person had been discharged therefrom, cured and restored to reason, shall establish the presumption of legal capacity in such person from the time of such discharge." Here Dr. Kay had been released as "sane and competent"; he had been provided with the formal certificate of "Discharge of Insane Person as Recovered" and the document was read into evidence.