[No. H026688. Sixth Dist. July 28, 2005.]

OAKLAND RAIDERS, Plaintiff and Appellant, v.
NATIONAL FOOTBALL LEAGUE et al., Defendants and Respondents.

## COUNSEL

Howard Rice Nemerovski Canady Falk & Rabkin, Kenneth G. Hausman, Simon J. Frankel and Matthew R. Schultz for Plaintiff and Appellant.

Bingham McCutchen, James L. Hunt, Dale E. Barnes, Michael T. Pyle; Ruby & Schofield and Allen J. Ruby for Defendants and Respondents.

## OPINION

PREMO, J.—The Oakland Raiders (Raiders), a member club of an unincorporated association known as the National Football League (NFL or League), sued the NFL and its commissioner, Paul Tagliabue. The Raiders alleged that the NFL and Tagliabue (collectively, defendants) took various actions that were discriminatory towards the Raiders and placed it at a competitive disadvantage vis-à-vis other member clubs. One legal theory that the Raiders advanced was breach of fiduciary duty. Defendants argued that this claim was without merit for a variety of reasons, including the absence of legal duty, and the requirement that courts abstain from involving themselves in disputes involving private voluntary associations. The court below, citing both reasons, agreed with defendants and granted summary adjudication. The Raiders appealed.

■ We are therefore called upon here to examine the parties' relationship to determine whether the NFL and its commissioner owe fiduciary duties to the Raiders. After reviewing the unique nature of the NFL business organization and the extent of the powers and duties of its commissioner, we conclude that neither defendant stands in a fiduciary relationship with the Raiders. We hold further that the nature of this conflict is one from which the courts properly abstain. Accordingly, after our de novo review, we conclude that summary adjudication was proper and we affirm the judgment.

## PROCEDURAL HISTORY[1]

The Raiders filed a fourth amended and supplemental complaint (complaint), consisting of 22 causes of action and 99 pages (excluding exhibits). The complaint's second cause of action—the only claim at issue in this appeal—asserted that the NFL and/or Tagliabue breached their fiduciary duties to the Raiders.

Broadly speaking, the complaint alleged that the Raiders was discriminated against and treated unfavorably as compared with the other member clubs.[2] The alleged breaches of fiduciary duty included: "singling the Raiders out" from other clubs and "treating the Raiders disparately and adversely"; permitting other member clubs to violate NFL rules, thereby giving them a competitive advantage over the Raiders; requiring that the Raiders (over its objection) participate with other member clubs in the European football league known as the "World League of American Football"; concealing information from the Raiders and excluding its participation in a lawsuit involving the former owner of the New England Patriots, William H. Sullivan, Jr.; and denying Al Davis (former Raiders' managing general partner) and his family permission to buy the Oakland Athletics baseball team, notwithstanding that defendants permitted violations of the League's "Cross-ownership Rule" by other club owners.[3] In addition, the Raiders

---

[1] The case has a lengthy procedural history that dates back over nine years. Part of that history is detailed in this court's prior opinion arising out of an appeal by the Raiders from the dismissal of claims against parties other than the NFL and Tagliabue. (See *Oakland Raiders v. National Football League* (2001) 93 Cal.App.4th 572, 579–580 [113 Cal.Rptr.2d 255], review den. Jan. 29, 2002 (*Oakland Raiders*).) We recite here only those aspects of the procedural history that are relevant to disposition of the instant appeal.

[2] We use the name "Raiders" in reference to the business entity (NFL club member); thus, its association with singular verbs is appropriate.

[3] The complaint alleged that *defendants* denied Davis and his family permission to buy the Oakland Athletics baseball team. It is undisputed, however, that *Tagliabue* had nothing to do with that matter, and that it was the former NFL commissioner, Pete Rozelle, who made the decision regarding Davis's potential ownership of the baseball team in 1979. (Tagliabue did not become NFL commissioner until 1989.)

alleged that Tagliabue committed further breaches of fiduciary duty: by removing Davis from the NFL Management Council Executive Committee in September 1995; by removing Raiders' representatives from NFL committees, and by excluding the Raiders from participating in significant NFL committees, thereby placing the Raiders at a competitive disadvantage; and by concealing from the Raiders certain rules violations by other member clubs.

In November 1998, defendants filed a motion for summary adjudication of the second cause of action of the complaint, denominated as "motion no. 5." The Raiders opposed this motion; its opposition consisted of more than 2600 pages. After the court heard extensive argument, on December 17, 1998, it granted summary adjudication as to the second cause of action.[4] The court based its decision, inter alia, upon the conclusions that (1) defendants owed no fiduciary duties to the Raiders, and (2) even were the breach of fiduciary duty claim legally viable, the court was required to abstain from deciding it.

Three months later, the Raiders attacked the order granting summary adjudication by filing a motion for new trial, a motion for reconsideration, and an alternative motion to amend the complaint. The court (1) denied the Raiders' motion for reconsideration, (2) denied without prejudice the motion for new trial, and (3) denied the motion for leave to amend.[5]

After intervening proceedings—including appellate proceedings in *Oakland Raiders*, *supra*, 93 Cal.App.4th 572, and at least one further summary adjudication motion (as to the 21st and 22nd causes of action of the complaint)—the court entered judgment on September 3, 2003.

The Raiders filed a notice of appeal on October 31, 2003. The appeal from the judgment was filed timely (Cal. Rules of Court, rule 2(a)(1)), and is a proper subject for appellate review. (Code Civ. Proc., § 437c, subd. (m); see also Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2005) ¶ 10:384, p. 10-122.12 [order granting summary judg-

---

[4] The trial court disposed of *six* defense summary adjudication motions in its December 1998 ruling. As we have noted, only the motion concerning the second cause of action is at issue in this appeal.

[5] The court denied the new trial motion without prejudice on the ground that it was premature because there was no judgment or appealable order from which a new trial motion could be brought under Code of Civil Procedure section 656 et seq. (See *Gilberd v. AC Transit* (1995) 32 Cal.App.4th 1494, 1501 [38 Cal.Rptr.2d 626].) The record does not reflect that the Raiders ever renewed its motion for new trial, and it does not specifically challenge the court's new trial order on appeal.

ment not itself appealable, but appeal lies from judgment entered on such order].)

## DISCUSSION

### I. *Standard of Review*

■ "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) As such, the summary judgment statute (Code Civ. Proc., § 437c), "provides a particularly suitable means to test the sufficiency of the plaintiff's prima facie case and/or of the defendant's [defense]." (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 203 [48 Cal.Rptr.2d 448].) A summary judgment motion must demonstrate that "material facts" are undisputed. (Code Civ. Proc., § 437c, subd. (b)(1).) The pleadings determine the issues to be addressed by a summary judgment motion. (*Metromedia, Inc. v. City of San Diego* (1980) 26 Cal.3d 848, 885 [164 Cal.Rptr. 510, 610 P.2d 407], revd. on other grounds *Metromedia, Inc. v. San Diego* (1981) 453 U.S. 490 [69 L.Ed.2d 800, 101 S.Ct. 2882].)

■ "A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (Code Civ. Proc., § 437c, subd. (f)(1).) Similar to summary judgment, the moving party's burden on summary adjudication is to establish evidentiary facts sufficient to prove or disprove the elements of a claim or defense. (*Id.*, § 437c, subds. (c), (f).)

■ The moving party "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar, supra*, 25 Cal.4th at p. 850, fn. omitted.) A defendant moving for summary judgment must " 'show[] that one or more elements of the cause of action . . . cannot be established' by the plaintiff." (*Id.* at p. 853, quoting Code Civ. Proc., § 437c, subd. (*o*)(2).) A defendant meets its burden by presenting affirmative evidence that negates an essential element of plaintiff's claim. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) Alternatively, a defendant meets its burden by submitting evidence "that the plaintiff does not possess, and cannot reasonably obtain, needed evidence" supporting an essential element of its claim. (*Aguilar, supra*, 25 Cal.4th at p. 855.)

■ Since both summary judgment and summary adjudication motions involve purely questions of law, we review the granting of summary judgment or summary adjudication de novo to ascertain from the papers whether there is a triable issue of material fact. (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1438 [111 Cal.Rptr.2d 534]; *Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1450 [75 Cal.Rptr.2d 54].) In doing so, we "consider[] all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

■ In performing an independent review of the granting of summary judgment, we conduct the same procedure employed by the trial court. We examine (1) the pleadings to determine the elements of the claim, (2) the motion to determine if it establishes facts justifying judgment in the moving party's favor, and (3) the opposition—assuming movant has met its initial burden—to "decide whether the opposing party has demonstrated the existence of a triable, material fact issue. [Citation.]" (*Chavez v. Carpenter, supra,* 91 Cal.App.4th at p. 1438; see also *Burroughs v. Precision Airmotive Corp.* (2000) 78 Cal.App.4th 681, 688 [93 Cal.Rptr.2d 124].) We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [116 Cal.Rptr.2d 158].)

II. *Issues on Appeal*

The Raiders asserts that the trial court erred in granting summary adjudication of the claim for breach of fiduciary duty. These claims of error are as follows:

1. The court erred in concluding that neither the NFL nor Tagliabue owed fiduciary duties to the Raiders.

2. The court erroneously applied the abstention doctrine of *California Dental Assn. v. American Dental Assn.* (1979) 23 Cal.3d 346 [152 Cal.Rptr. 546, 590 P.2d 401] (*California Dental*), in concluding that the controversy here was not one in which the court should intervene.

3. The court concluded incorrectly that the claim was barred due to the Raiders' failure to exhaust internal remedies within the NFL.

4. The court erred in holding that certain additional breach of fiduciary duty claims had not been pleaded and were thus beyond matters that it could consider in connection with the motion for summary adjudication. The Raiders contends: (a) that the claims *were* properly pleaded; (b) that any failure to plead the claims represented an immaterial variance such that the court should have considered them in connection with the motion; and (c) the court, in any event, should have granted the Raiders leave to amend the second cause of action after the motion was decided.

We will address below the Raiders' first, second, and fourth contentions.[6]

## III. *Whether Defendants Owed Fiduciary Duties to the Raiders*

### A. *Claims Arising Out of Fiduciary Relationships, Generally*

■ We start with a recitation of some of the basic principles of the law of fiduciary duty. "[A] fiduciary relationship is a recognized legal relationship such as guardian and ward, trustee and beneficiary, principal and agent, or attorney and client [citation]." (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 271 [130 Cal.Rptr.2d 601].)[7] A fiduciary must give "priority to the best interest of the beneficiary. [Citation.]" (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 222 [197 Cal.Rptr. 783, 673 P.2d 660] (*Children's Television*).) In addition to this duty of preference toward the beneficiary, the fiduciary also is required to manage the subject matter of the relationship (or res) with due care, must account to the beneficiary, and must keep the beneficiary fully informed as to all matters pertinent to the beneficiary's interest in the res. (See Chodos, The Law of Fiduciary Duties (2000) pp. LIV-LV.)

■ Our Supreme Court has acknowledged that it is difficult to enunciate the precise elements required to show the existence of a fiduciary relationship. (*Children's Television, supra*, 35 Cal.3d at p. 221.) But the high court

---

[6] We conclude below that the Raiders' breach of fiduciary duty claim was barred as a matter of law for two reasons: (1) the absence of fiduciary duty owed by defendants to the Raiders; and (2) the abstention doctrine of *California Dental* applies. Accordingly, we need not, and do not decide the further question of whether summary adjudication was also proper because the Raiders failed to exhaust internal NFL remedies. (See *Hiser v. Bell Helicopter Textron Inc.* (2003) 111 Cal.App.4th 640, 655 [4 Cal.Rptr.3d 249] [appellate courts generally "decline to decide questions not necessary to the decision"]; see also *Robinson v. Hewlett-Packard Corp.* (1986) 183 Cal.App.3d 1108, 1131 [228 Cal.Rptr. 591] [reviewing court will not consider whether plaintiff's opposition to summary judgment presented triable issue of material fact if it determines that plaintiff's complaint failed to state a cause of action as matter of law].)

[7] We acknowledge that a fiduciary duty may arise out of a confidential relationship that is not one that is considered a legally recognized fiduciary relationship. (See *Richelle L. v. Roman Catholic Archbishop, supra*, 106 Cal.App.4th at pp. 271–273.) No such claim of a confidential relationship is presented here by the Raiders, and none is presented in the record before us.

has noted that "before a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law. [Citations.]" (*Ibid.*; see also *GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.* (2000) 83 Cal.App.4th 409, 416 [99 Cal.Rptr.2d 665] (*GAB Business*) [two types of fiduciary duties, i.e., "those imposed by law and those undertaken by agreement"], disapproved on other grounds in *Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1154 [17 Cal.Rptr.3d 289, 95 P.3d 513].)

 Fiduciary duties arise as a matter of law "in certain technical, legal relationships." (*GAB Business, supra,* 83 Cal.App.4th at p. 416.) While this list of special relationships is one that "is not graven in stone" (Chodos, The Law of Fiduciary Duties, *supra,* p. 1), it is useful to identify many of the relationships that give rise to fiduciary duties. They include relationships between: (1) principal and agent (*Recorded Picture Company [Productions] Ltd. v. Nelson Entertainment, Inc.* (1997) 53 Cal.App.4th 350, 369–370 [61 Cal.Rptr.2d 742] (*Recorded Picture*)),[8] including real estate broker/agent and client (*Smith v. Zak* (1971) 20 Cal.App.3d 785, 792–793 [98 Cal.Rptr. 242]), and stockbroker and customer (*Black v. Shearson, Hammill & Co.* (1968) 266 Cal.App.2d 362, 367 [72 Cal.Rptr. 157]); (2) attorney and client (*Rader v. Thrasher* (1962) 57 Cal.2d 244, 250 [18 Cal.Rptr. 736, 368 P.2d 360]); (3) partners (*Koyer v. Willmon* (1907) 150 Cal. 785, 787–788 [90 P. 135]; Corp. Code, § 16404); (4) joint venturers (*Sime v. Malouf* (1949) 95 Cal.App.2d 82, 98 [212 P.2d 946]); (5) corporate officers and directors, on the one hand, and the corporation and its shareholders, on the other hand (*Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327, 345 [49 Cal.Rptr. 825, 411 P.2d 921]); (6) husband and wife, with respect to the couple's community property (*Vai v. Bank of America* (1961) 56 Cal.2d 329, 337 [15 Cal.Rptr. 71, 364 P.2d 247]; see also Fam. Code, § 1100, subd. (e)); (7) controlling shareholders and minority shareholders (*Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 108–112 [81 Cal.Rptr. 592, 460 P.2d 464] (*Jones*)); (8) trustee and trust beneficiary (*Estate of Vokal* (1953) 121 Cal.App.2d 252, 257 [263 P.2d 64]); (9) guardian and ward (*Estate of Kay* (1947) 30 Cal.2d 215, 226 [181 P.2d 1];

---

[8] "An agent is a fiduciary with respect to matters within the scope of his agency." (Rest.2d Agency, § 13.) As such, the agent is required "to act primarily for the benefit of another in matters connected with his undertaking" and has "the duty [to his principal] to account for profits arising out of the employment, the duty not to act as, or on account of, an adverse party without the principal's consent, the duty not to compete with the principal on his own account or for another in matters relating to the subject matter of the agency, and the duty to deal fairly with the principal in all transactions between them." (Rest.2d Agency, § 13, com. a, p. 58; see also *Cross v. Bonded Adjustment Bureau* (1996) 48 Cal.App.4th 266, 277 [55 Cal.Rptr.2d 801].)

Prob. Code, § 2101); (10) pension fund trustee and pensioner beneficiary (*Lix v. Edwards* (1978) 82 Cal.App.3d 573, 578 [147 Cal.Rptr. 294]); (11) executor and decedent's estate (*Estate of Boggs* (1942) 19 Cal.2d 324, 333 [121 P.2d 678]); and (12) trustee and trust beneficiaries. (*Penny v. Wilson* (2004) 123 Cal.App.4th 596, 603 [20 Cal.Rptr.3d 212]; Prob. Code, §§ 16004, 16081, subd. (a).)

In numerous cases, however, California courts have rejected attempts to extend fiduciary obligations to relationships where the imposition of such an affirmative duty is unwarranted. For instance, no fiduciary relationship was found to exist as between the following: (1) an attorney and his cocounsel under the theory that the former's malpractice in handling of a mutual client's case caused damage to cocounsel in the loss of fees (*Beck v. Wecht* (2002) 28 Cal.4th 289, 292–298 [121 Cal.Rptr.2d 384, 48 P.3d 417]); (2) one shareholder and another by virtue of the fact that they were former partners in an entity that was later incorporated (*Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1158–1159 [23 Cal.Rptr.3d 335]); (3) an unmarried cohabitant and his cohabitant concerning the operation of the former's business (*Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 448 [78 Cal.Rptr.2d 101]); (4) a movie distributor and movie producers under a distribution contract (*Recorded Picture, supra,* 53 Cal.App.4th at pp. 369–370); (5) a homeowner's association and the buyer of an individual unit (with respect to disclosure of known construction defects) (*Kovich v. Paseo Del Mar Homeowners' Assn.* (1996) 41 Cal.App.4th 863, 869–870 [48 Cal.Rptr.2d 758]); (6) a trade union and a union member (apart from the union's duty of fair representation) (*Hussey v. Operating Engineers Local Union No. 3* (1995) 35 Cal.App.4th 1213, 1221 [42 Cal.Rptr.2d 389] (*Hussey*)); (7) a bank and its borrowers (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979–981 [21 Cal.Rptr.2d 834]); (8) a corporation and its bondholders (*Pittelman v. Pearce* (1992) 6 Cal.App.4th 1436, 1444–1445 [8 Cal.Rptr.2d 359]); (9) a clearing broker and an investment broker's customer (*Mars v. Wedbush Morgan Securities, Inc.* (1991) 231 Cal.App.3d 1608, 1614–1615 [283 Cal.Rptr. 238]); (10) an insurer and its insured (*Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1148–1149 [271 Cal.Rptr. 246]);[9] and (11) a manufacturer and an authorized dealer (*Rickel v. Schwinn Bicycle Co.* (1983) 144 Cal.App.3d 648, 653–655 [192 Cal.Rptr. 732]).

Many of the cases rejecting breach of fiduciary duty claims have been based (at least in part) upon the principle, as enunciated in *Waverly Productions, Inc. v. RKO General, Inc.* (1963) 217 Cal.App.2d 721, 732 [32

---

[9] Although an insurer has special obligations of good faith towards its insured, an insurer is not a "true fiduciary" with respect to its insured. (*Love v. Fire Ins. Exchange, supra,* 221 Cal.App.3d at pp. 1147–1149.)

Cal.Rptr. 73], that "[a] mere contract or a debt does not constitute a trust or create a fiduciary relationship." (See *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 30–31, 33–34 [130 Cal.Rptr.2d 860]; *Recorded Picture, supra,* 53 Cal.App.4th 350, 370; *Rickel v. Schwinn Bicycle Co., supra,* 144 Cal.App.3d at pp. 654–655.) As a general rule, courts finding no fiduciary duty have done so "where other legal relationships clearly existed between the parties which 'covered' the transaction in suit and which were inconsistent with the existence of fiduciary duty." (Chodos, The Law of Fiduciary Duties, *supra,* p. 61.)

### B. *Whether Fiduciary Relationship Existed as a Matter of Law*

We first examine whether there was a fiduciary relationship between defendants and the Raiders as a matter of law. More precisely—since we are reviewing a disposition after summary adjudication—we must determine from the papers filed in connection with the summary adjudication motion whether there was a triable issue of fact as to the existence of a fiduciary relationship, by virtue of the nature of the business relationship between the Raiders and defendants.[10]

As the Ninth Circuit Court of Appeals has previously recognized, "[t]he NFL is [a] unique business organization." (*Los Angeles Memorial Coliseum Com'n v. N.F.L.* (9th Cir. 1984) 726 F.2d 1381, 1401.) It is perhaps for this reason that there is no authority cited by the parties—or known by this court to exist—that is definitive on the question of whether the NFL or its commissioner owes fiduciary duties to one of the NFL's member clubs (in this case, the Raiders). Certainly none of the examples of fiduciary relationships described in part III. A, *ante,* offers an answer to this question.

The Raiders relies extensively on *Jones, supra,* 1 Cal.3d 93, in support of its assertion that defendants owed the Raiders fiduciary duties. For a number

---

[10] The Raiders attaches great importance to the fact that over one year before the summary adjudication motion, the trial court overruled defendants' demurrer to the Raiders' complaint, thereby rejecting defendants' assertion that they owed no fiduciary duty to the Raiders as a matter of law. Unlike its consideration of the demurrer, the court at the later summary adjudication motion considered a significant amount of evidence. Even had the issues in the demurrer been identical to the later summary adjudication motion, however, summary judgment/adjudication motions are law and motion proceedings entirely distinct from an attack on a pleading by demurrer. Therefore, it was proper for the trial court to decide the fiduciary duty claim on summary adjudication differently from its prior disposition of the claim on demurrer. (See *Community Memorial Hospital v. County of Ventura* (1996) 50 Cal.App.4th 199, 204–205 [56 Cal.Rptr.2d 732].)

of reasons, *Jones* is inapposite. In *Jones*, the Supreme Court held definitively that majority shareholders owe fiduciary duties to the corporation and its minority shareholders "to use their ability to control the corporation in a fair, just, and equitable manner." (*Id.* at p. 108.) Thus, under the circumstances presented in that case, the court concluded that "when, as here, no market [for the corporation's stock] exists, the controlling shareholders may not use their power to control the corporation for the purpose of promoting a marketing scheme that benefits themselves alone to the detriment of the minority." (*Id.* at p. 115.)

Most notably, the discussion of fiduciary duties in *Jones* was premised on the existence of a *corporation, controlling shareholders, and minority shareholders*. No such organizational structure is presented in the instant appeal. To the contrary, it is without dispute that the NFL is *an unincorporated not-for-profit association* of 31 (now 32) member clubs. Indeed, we acknowledged this organizational status in a prior appeal by the Raiders. (See *Oakland Raiders, supra,* 93 Cal.App.4th 572, 578.) As such, neither the NFL nor its member clubs fit the *Jones* model of fiduciary duties owed by majority shareholders to their corporation and to minority shareholders.

Even were we to ignore this glaring distinction, the claim here is that the *organization* (the NFL), not its majority members (or purported "majority shareholders"), owes the Raiders fiduciary duties. *Jones* is thus inapposite on this basis as well.

Moreover, we find the entire rationale of *Jones* to have no application to the facts of this case. In *Jones*, the Supreme Court addressed the inherent unfairness of majority shareholders of a for-profit corporation using their dominant position to further their own interests at the expense of minority shareholders. Here, the Raiders' claim is that the nonprofit organization itself (and its commissioner) acted in a manner that was prejudicial to the Raiders. This contention is a far cry from the corporate abuse that the Supreme Court addressed in *Jones*, namely, controlling shareholders misusing their position of dominance for their personal benefit and to the detriment of minority shareholders.

The Raiders' reliance upon *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642 [191 Cal.Rptr. 209] (*Cohen*), is likewise misplaced. In *Cohen*, the court held that the homeowners' association—a nonprofit corporation—owed a fiduciary duty to its members in connection with its approval or rejection of certain improvements proposed by homeowners. (*Id.* at pp. 650–651.) As a result, the *Cohen* court concluded that "the trial court

must review the Association's decision approving [defendant homeowner's] fence to insure that it was neither arbitrary nor in violation of the restrictions contained in the Declaration [of covenants, conditions and restrictions governing the development]." (*Id.* at p. 652.) Citing *Raven's Cove Townhomes, Inc. v. Knuppe Development Co.* (1981) 114 Cal.App.3d 783, 799 [171 Cal.Rptr. 334], the *Cohen* court concluded that the homeowners' association owed fiduciary duties to its members based upon "recognition of the increasingly important role played by private homeowners' associations in such public-service functions as maintenance and repair of public areas and utilities, street and common area lighting, sanitation and the regulation and enforcement of zoning ordinances." (*Cohen, supra,* at pp. 650–651.)

■ There are at least two significant reasons that prevent us from concluding that *Cohen* supports the Raiders' position. In the first instance, the *nature of the entity* in *Cohen* was entirely different. The homeowners' association that the court found to owe fiduciary duties to its members was a nonprofit *corporation*, not an unincorporated association as is the case with the NFL. The Raiders' attempts to trivialize this issue notwithstanding, this distinction is a significant one. As a nonprofit corporation, there were fiduciary obligations *imposed by statute* upon the officers and directors of the homeowners' association: "Directors of nonprofit corporations such as the Association are fiduciaries who are required to exercise their powers in accordance with the duties imposed by the Corporations Code. [Citation.]" (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 513 [229 Cal.Rptr. 456]; see also Corp. Code, § 5231.)

■ Second, homeowners' associations, as the *Cohen* court noted, perform "public-service functions" (*Cohen, supra,* 142 Cal.App.3d at p. 650), and have "increasingly 'quasi-governmental' . . . responsibilities." (*Id.* at p. 651; see also *Chantiles v. Lake Forest II Master Homeowners Assn.* (1995) 37 Cal.App.4th 914, 922 [45 Cal.Rptr.2d 1] ["[f]or many Californians, the homeowners association functions as a second municipal government, regulating many aspects of their daily lives"].) In contrast, the NFL neither performs "public-service functions," nor acts in a manner similar to homeowners' associations. Furthermore, homeowners' associations are organized to regulate and govern various aspects of unit owners' day-to day occupancy and maintenance of their homes; the NFL is organized for a far different purpose.

The Raiders also cites two cases involving pension plan retirement funds. In *Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 392–393 [216 Cal.Rptr. 733], the Supreme Court concluded that

trustees who administer pension plan retirement funds owe fiduciary duties of good faith and fair dealing towards the pensioner-beneficiaries. Similarly, in *Masters v. San Bernardino County Employees Retirement Assn.* (1995) 32 Cal.App.4th 30, 43–45 [37 Cal.Rptr.2d 860], the court acknowledged the existence of fiduciary duties owed by a retirement plan and its administrator to a pension plan beneficiary. The conclusions in these two cases are hardly surprising and, in any event, have no application to this case. The Raiders does not contend that the NFL owes it fiduciary duties because it administers the Raiders' pension plan retirement funds.

Further, the mere fact that the entities in *Hittle* and *Masters* were both associations—as is the case here with the NFL—is immaterial. It was the *nature of the relationship* between the parties as trustee-beneficiary that resulted in a finding of a fiduciary relationship in both *Hittle* and *Masters*. No such form of relationship exists here as between defendants and the Raiders.[11]

■ The Raiders has cited no cases—and we are aware of none—in which it has been held as a blanket proposition that a voluntary unincorporated association and/or its leadership owes fiduciary duties to its members. A voluntary association, although it has some attributes of a legal entity, is not the equivalent of a corporation. (See 3 Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1992) § 424.01, p. 19-566 (rel. 81-5/02); see also 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 45, pp. 553–554.) Neither *Hittle* nor *Masters* rests on the principle that an unincorporated association and/or its leaders stand in a fiduciary relationship with respect to its members under all circumstances. We decline to reach that conclusion here. (See *Hussey, supra,* 35 Cal.App.4th 1213, 1221 [holding trade union association was not fiduciary of union members].)

■ Finally, we reject the Raiders' intimation that a fiduciary relationship exists between it and the defendants because of an alleged joint venture.[12] A joint venture, of necessity, "requires an agreement under which

---

[11] The Raiders' claim notwithstanding, *Dietz v. American Dental Ass'n.* (E.D. Mich. 1979) 479 F.Supp. 554—a case in which a federal trial court applied Michigan substantive law—is not controlling. There, the court concluded that "[w]here a professional association has monopoly power and membership in the association significantly affects the member's practice of his profession, courts will hold the association has a fiduciary duty to be substantively rational and procedurally fair." (*Id.* at p. 557.) There is no claim here that the NFL is a professional association or that it excluded the Raiders from membership status.

[12] Defendants argue at some length that no joint venture exists with respect to the NFL and its member clubs. The extent to which the Raiders contends that the NFL is a joint venture and thus owes the Raiders fiduciary duties is not entirely clear to us. While the Raiders makes a fleeting reference in its opening brief to "joint venture vis-à-vis their individual members," no such argument appears in its reply. It is clear, in any event, that there is no joint venture

the parties have (1) a joint interest in a common business, (2) an understanding that profits and losses will be shared, and (3) a right to joint control. [Citations.]" (*Ramirez v. Long Beach Unified School Dist.* (2002) 105 Cal.App.4th 182, 193 [129 Cal.Rptr.2d 128].) Here, there is no sharing of profits and losses by member clubs indicative of a joint venture. As one federal district court concluded, specifically with respect to the NFL: "Strictly speaking, the NFL teams are not engaged in a joint venture. 'A joint venture is a joint business undertaking of two or more parties who share the risks as well as the profits of the business.' [Citation.] Though the NFL teams share revenues, they do not share profits or losses." (*Los Angeles Memorial Coliseum v. N.F.L.* (S.D.Cal. 1979) 468 F.Supp. 154, 162, fn. 9; see also *Los Angeles Memorial Coliseum Com'n v. N.F.L.*, *supra*, 726 F.2d 1381, 1390 [NFL clubs do not share "profits and losses . . . a feature common to partnerships"].) There is thus no merit to the Raiders' claim for breach of fiduciary duty arising out of a joint venture.[13]

We conclude therefore that the relationship between the Raiders, on the one hand, and the NFL and Tagliabue, on the other hand, is not one under which a fiduciary relationship exists as a matter of law. The Raiders' contentions notwithstanding, we see no reasoned basis for finding such a fiduciary relationship by extending the holdings in such cases as *Jones, supra* 1 Cal.3d 93 and *Cohen, supra*, 142 Cal.App.3d 642 in a way that we believe is both unwarranted and inconsistent with the rationale found in those opinions.

### C. *Whether Defendants Undertook Fiduciary Responsibilities*

We now review whether, irrespective of the absence of fiduciary duty imposed by law, the NFL and Tagliabue undertook fiduciary responsibilities to the Raiders by agreement. After such review, we find quite the opposite to be true.

As we noted in the prior appeal: "The NFL is governed by a constitution that generally requires a three-quarters vote for action. The chief executive

---

relationship from which the law would impose upon the NFL fiduciary duties toward individual clubs.

[13] Although not controlling to our reasoning here, we note with interest that in *Los Angeles Memorial Coliseum Com'n v. N.F.L.*, *supra*, 726 F.2d 1381, the parties there asserted positions that are essentially opposite from those made in this appeal: "The NFL contends the league structure is in essence a single entity, akin to a partnership or joint venture, precluding application of Sherman Act section 1 which prevents only contracts, combinations or conspiracies in restraint of trade. The Los Angeles Coliseum and Raiders reject this position and assert the League is composed of 28 separate legal entities which act independently." (*Id.* at p. 1387.)

officer is the commissioner, who is appointed by a two-thirds vote of the clubs. (Tagliabue has been the commissioner at all relevant times.)" (*Oakland Raiders, supra,* 93 Cal.App.4th 572, 579.) The Raiders admits that the NFL's constitution and bylaws (NFL constitution) govern the NFL and constitute a contract to which all member clubs agreed.

Thus, the NFL and its member clubs are controlled by the following principle: " '[T]he rights and duties of the members as between themselves and in their relation to [a private voluntary] association, in all matters affecting its internal government and the management of its affairs, are measured by the terms of [its] constitution and bylaws.' [Citation.]" (*California Dental, supra,* 23 Cal.3d 346, 353; see also *Oakland Raiders, supra,* 93 Cal.App.4th at p. 582.) In light of the fact that the NFL and its member clubs are governed by the NFL constitution, we must examine that document carefully in our evaluation of the Raiders' breach of fiduciary duty claim.

Even the most cursory review of the NFL constitution discloses the enormous power vested in the commissioner with respect to the business operations of the League and its member clubs. As a blanket proposition, the member clubs agreed that "[t]hey, and each of them, shall be bound by and will observe all decisions of the [c]ommissioner of the League in all matters within his jurisdiction." Further, each member club agreed to a broad release of, among others, the NFL and the commissioner in connection with any official acts taken on behalf of the NFL.[14]

The commissioner's authority under the NFL constitution ranges from very broad issues to matters that the uninformed might consider minutiae.[15] The commissioner has the power to appoint operating committees as the NFL "deems necessary and appropriate," with the commissioner directing and chairing such committees. The section of the NFL constitution that concerns the commissioner's qualifications and duties (Article VIII) consists of eight pages of text. The commissioner is empowered under that article (among other things) to: (1) arbitrate a broad array of disputes involving NFL employees, NFL members, coaches, employees of members, players, and

---

[14] The release reads in relevant part: "[The member clubs, as well as each club's owners, officers, directors, shareholders and partners], and each of them, to the fullest extent permitted by law, release and indemnify the [c]ommissioner, the League and every employee thereof . . . from and against any and all claims, demands, suits or other proceedings, whether for damages or otherwise, which they . . . may at any time have or assert in connection with or by reason of any action taken or not taken by the released/indemnified parties in their official capacities on behalf of the League or any committee thereof."

[15] For instance, the commissioner under certain circumstances must approve the colors of uniforms worn by visiting teams.

NFL officials;[16] (2) incur expenses on the NFL's behalf; (3) interpret and establish policy and procedure with respect to the NFL constitution and its enforcement; (4) arrange for and negotiate contracts on behalf of the NFL; (5) take disciplinary action against any owner, player, coach, officer, director, or employee of any member club, or against any NFL officer, employee or official;[17] and (6) disapprove contracts between players and member clubs.

The more mundane (but nonetheless significant) powers of the commissioner specified in the NFL constitution include: (1) deciding appropriate penalties in the event of player tampering; (2) approval of a member club's hiring of any coach, or administrative/supervisory employee; (3) approval of a member club's contract for the telecast or broadcast of its games (including the sponsorship for such games); (4) the sale of all radio and television and film rights for conference championship games and the Super Bowl; (5) control over conference championship and Super Bowl games; (6) preparing and modifying game schedules; (7) presiding over player drafts and resolving disputes arising out of the drafts; (8) approval of player trades; (9) suspension of players for violations of the NFL constitution, player contract, NFL rule, or club rule; and (10) investigation of a member club's placement of players on "Reserve/Injured," "Reserve," or "Reserve/Suspended" status, and (where

---

[16] Section 8.3 of the NFL constitution reads: "The [c]ommissioner shall have full, complete, and final jurisdiction and authority to arbitrate: [¶] (a) Any dispute involving two or more members of the League, or involving two or more holders of an ownership interest in a member club of the League, certified to him by any of the disputants. [¶] (b) Any dispute between any player, coach and/or other employee of any member of the League (or any combination thereof) and any member club or clubs. [¶] (c) Any dispute between or among players, coaches, and/or other employees of any member club or clubs of the League, other than disputes unrelated to and outside the course and scope of the employment of such disputants within the League. [¶] (d) Any dispute between a player and any official of the League. [¶] (e) Any dispute involving a member or members in the League, or any players or employees of the members or the League, or any combination thereof, that in the opinion of the [c]ommissioner constitutes conduct detrimental to the best interests of the League or professional football."

[17] The commissioner's disciplinary powers under the NFL constitution are extremely significant. The commissioner may suspend and/or impose a fine of *up to $500,000*, and/or may cancel the person's contract with the NFL or club member. The commissioner is empowered to take such action, after notice and hearing, where the commissioner decides that the person "has either violated the [NFL constitution] . . . , or has been or is guilty of conduct detrimental to the welfare of the League or professional football." The commissioner is also empowered to refer disciplinary matters to the NFL executive committee in instances where the commissioner believes that greater punishment is warranted. In those cases, the commissioner may recommend the most draconian of punishments, cancellation of a member club's NFL franchise. Further, the commissioner may impose severe sanctions—including expulsion from the League—for gambling on the outcome or score of any NFL game.

such placement was improper) taking disciplinary action against the member club.

It is clear from a comprehensive review of the NFL constitution that neither the NFL nor Tagliabue undertook the role of a fiduciary towards any particular member club, including the Raiders. To the contrary, the expansive powers of the commissioner delineated in the NFL constitution strongly demonstrate the absence of such a fiduciary relationship. As noted, a fiduciary must give "priority to the best interest of the beneficiary." (*Children's Television, supra*, 35 Cal.3d 197, 222.) The breadth of the commissioner's powers plainly shows that there are numerous and varied potential circumstances in which the commissioner may be required to act *against* the best interests of the Raiders as a member club. (Cf. *Love v. Fire Ins. Exchange, supra*, 221 Cal.App.3d at pp. 1148–1149 [insurer not a fiduciary to insured, inter alia, because insurer "may give its own interests consideration equal to that it gives the interests of its insured," and "is not required to disregard the interests of its shareholders and other policyholders when evaluating claims"].)

There is a vast array of potential circumstances under which the commissioner may take action that is adverse to a particular member club (such as the Raiders). Under the NFL constitution, the commissioner could act in a manner potentially adverse to the Raiders, inter alia, by: (1) arbitrating a dispute between the Raiders and a coach, player, other employee, or other member club; (2) interpreting or enforcing the NFL constitution in a manner incongruent with the Raiders' position; (3) disapproving a Raiders player contract or the proposed hiring of a Raiders coach, administrative, or supervisory employee; (4) disapproving a player trade proposed by the Raiders; or (5) resolving a player draft dispute adversely to the Raiders. Further, as we have noted, the commissioner's disciplinary powers under the NFL constitution are very extensive (see fn. 17, *ante*); those powers include the commissioner being able to discipline any Raiders' owner, player, coach, or employee, to discipline the Raiders where the club improperly assigned a player to a particular status, and to assess penalties against the Raiders for player tampering. We can readily imagine numerous scenarios where the NFL and its commissioner might take action involving a member club such as the Raiders—either through disciplinary action or other action authorized under the NFL constitution—that would leave the club without the services of a talented coach, player, or other employee.

There are thus numerous circumstances where the NFL and its commissioner would be contractually obligated to take action adverse to the Raiders. In such cases, the NFL and the commissioner would be acting in the best interests of the League but certainly *not* in the Raiders' best interests.

Moreover, such official actions—at least based upon the literal wording of the constitution (see fn. 14, *ante*)—might be governed by the prior release given by the Raiders under the constitution; obviously such blanket absolution for official action runs counter to the notion that the NFL or Tagliabue owes a fiduciary duty " ' " 'to act with the utmost good faith for the benefit of the other party.' " ' " (*Richelle L. v. Roman Catholic Archbishop, supra*, 106 Cal.App.4th 257, 270.)[18] There is simply no factual basis for concluding that either the NFL or the commissioner undertook by agreement fiduciary responsibilities to member clubs such as the Raiders.

Likewise, we find no merit to the argument that Tagliabue was the Raiders' fiduciary because he signed a 1996 settlement agreement as commissioner of the NFL on the League's behalf and on behalf of the NFL's member clubs. This lone matter does not, of itself, constitute an agreement on Tagliabue's part to act as agent for the Raiders. (See *Southern Pacific Thrift & Loan Assn. v. Savings Assn. Mortgage Co.* (1999) 70 Cal.App.4th 634, 639 [82 Cal.Rptr.2d 874] [mere use of word "trustee" in loan participation agreement did not result in loan originator becoming fiduciary to financial institution].) There is no evidence here " 'of the essential characteristic of the right of control' " required for a finding of agency. (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 572 [6 Cal.Rptr.3d 746]; see also *DeSuza v. Andersack* (1976) 63 Cal.App.3d 694, 699 [133 Cal.Rptr. 920].) Indeed, it is readily apparent—both from the text of the NFL constitution and the claims asserted by the Raiders—that the Raiders do *not* control the commissioner's actions. We therefore reject any claim by the Raiders that Tagliabue owed fiduciary duties to the Raiders under an unfounded principal-agent theory.[19]

For all of the above reasons, we conclude that there was no fiduciary relationship between defendants and the Raiders arising either as a result of agreement or by operation of law. Accordingly, the court below properly granted summary adjudication of the second cause of action.

IV. *Applicability of Abstention Doctrine Under California Dental*

The Raiders contends that the trial court also erred by concluding that it was required to abstain from this intra-association dispute under

---

[18] The question of the applicability of such release provisions is not argued by the parties here and is not before us. We take no position on this issue.

[19] The absence of such a principal-agency relationship is a matter that was appropriate for resolution by summary adjudication. Although agency is generally a question of fact, the issue may be determined by the court without trial where the undisputed facts negate any such relationship. (See *Universal Bank v. Lawyers Title Ins. Corp.* (1997) 62 Cal.App.4th 1062, 1066 [73 Cal.Rptr.2d 196]; *Magnecomp Corp. v. Athene Co.* (1989) 209 Cal.App.3d 526, 536 [257 Cal.Rptr. 278].)

*California Dental, supra,* 23 Cal.3d 346. It argues that the court's decision was based on an unwarranted expansion of the abstention doctrine. The Supreme Court in *California Dental* (the Raiders asserts) "held that courts should not interfere in 'intra-association disputes' concerning whether certain conduct breaches an association's bylaws unless that conduct 'plainly contravenes' the association's bylaws." Stated otherwise, the abstention doctrine applies only to intra-association disputes that involve the association's bylaws. Because the Raiders' claims are *not* ones that concern the interpretation of NFL bylaws (the Raiders argues), the abstention doctrine does not apply.

We disagree. The abstention doctrine as enunciated by the Supreme Court in *California Dental* applies to the Raiders' claim here. Thus, even were there triable issues as to the existence of a fiduciary relationship between defendants and the Raiders—and, as we have concluded in part III, *ante*, there were none—summary adjudication of this claim under the abstention doctrine of *California Dental* was nonetheless proper.

The Raiders' argument represents a second attempt to convince this court that abstention under *California Dental* applies only to a narrow range of intra-association disputes. In *Oakland Raiders, supra,* 93 Cal.App.4th 572, 583, we rejected the Raiders' assertion that *California Dental* applies only in the narrow context of a dispute following "judicial review of the decision of a neutral quasi-judicial body" established by the association. In our rejection of the Raiders' contention there, we held that "[t]o the contrary, the case language [of *California Dental*] applies broadly." (*Oakland Raiders, supra,* at p. 583.)

In this appeal, the Raiders asserts that the abstention doctrine, as enunciated by the Supreme Court in *California Dental*, is limited to disputes involving voluntary associations' noncompliance with their own bylaws. Once again, the Raiders—in this second appeal—misconstrues *California Dental.*

In *California Dental*, the state dental society expelled a member dentist after hearing, concluding that he had violated both its code of ethics and those of the national society of which the state society was a constituent. (*California Dental, supra,* 23 Cal.3d at p. 351.) The national society reversed the expulsion after the dentist appealed; in doing so, it did not consider whether the dentist had violated the state society's code of ethics. (*Id.* at pp. 351, 355.) Because the national society's bylaws permitted constituents to have higher ethical standards—which was the case in this instance—the trial court granted the state society's petition for writ of mandate, ordering the national society to rehear the dentist's appeal by considering the state society's higher standards. (*Id.* at p. 355.) The Supreme Court affirmed.

The Supreme Court commenced its analysis by acknowledging that the terms of a voluntary association's constitution and bylaws prescribe the rights and duties of its members. (*California Dental, supra,* 23 Cal.3d at p. 353.) The court then stated: "In many disputes in which such rights and duties are at issue, however, the courts may decline to exercise jurisdiction. Their determination not to intervene reflects their judgment that the resulting burdens on the judiciary outweigh the interests of the parties at stake. One concern in such cases is that judicial attempts to construe ritual or obscure rules and laws of private organizations may lead the courts into what Professor Chafee called the 'dismal swamp.' [Citation.] Another is with preserving the autonomy of such organizations. [Citation.] We stated in *Pinsker* v. *Pacific Coast Society of Orthodontists* [(1974)] 12 Cal.3d [541,] 558 [116 Cal.Rptr. 245, 526 P.2d 253], that 'in adjudicating a challenge to the society's rule as arbitrary a court properly exercises only a limited role of review. As the Arizona Supreme Court observed in *Blende* v. *Maricopa County Medical Society* [(1964)] 96 Ariz. 240 [393 P.2d 926, 930]: "In making such an inquiry, the court must guard against unduly interfering with the Society's autonomy by substituting judicial judgment for that of the Society in an area where the competence of the court does not equal that of the Society . . . ." ' " (*Id.* at pp. 353–354.)

 The court went on to identify action that plainly contravenes the unambiguous language of an association's bylaws as *a particular instance* in which judicial intervention *would be appropriate*, i.e., because such action would constitute " ' "an abuse of discretion, and a clear, unreasonable and arbitrary invasion of [the party's] private rights." ' [Citation.]" (*California Dental, supra,* 23 Cal.3d at p. 354.) Under those circumstances, if the action "plainly contravenes the [association's] bylaws . . . and if the burden on the courts and on the interest of the [association] in its autonomy do not outweigh the [member's] interests, it is appropriate for courts to exercise jurisdiction." (*Ibid.*; see also *Lawson v. Hewell* (1897) 118 Cal. 613, 620 [50 P. 763].)[20]

To reiterate, "the case language [of *California Dental*] applies broadly." (*Oakland Raiders, supra,* 93 Cal.App.4th at p. 583.) As we also noted before, the Supreme Court in *California Dental* "affirmatively stated that it was

---

[20] In a Maryland case that cited *California Dental* and contained a thoughtful discussion of the subject of judicial intervention of intra-association disputes, the appellate court reversed the trial court's decision to intervene in a dispute between a voluntary organization and its members. (See *NAACP v. Golding* (1996) 342 Md. 663 [679 A.2d 554].) There, the court noted that Maryland's "narrow rule" precluding judicial intervention, except in instances of "fraud"—which it defined as "includ[ing] 'action unsupported by facts or otherwise arbitrary' " (*id.* 679 A.2d at p. 561)—was "in essence analogous to the business judgment rule applicable to incorporated organizations." (*Ibid.*)

applying general common law that governed disputes within private organizations." (*Id.* at p. 584.) From our careful review of *California Dental*, we conclude that the abstention doctrine described by the Supreme Court was one that applies broadly to intra-association disputes, irrespective of whether the particular dispute concerns a claimed breach of association bylaws.

██ This conclusion is consistent with other cases that have followed *California Dental.* (See *Berke v. Tri Realtors* (1989) 208 Cal.App.3d 463, 469 [257 Cal.Rptr. 738] [abstention doctrine means that "[c]ourts must guard against unduly interfering with an organization's autonomy by substituting judicial judgment" for the organization's]; *California Trial Lawyers Assn. v. Superior Court* (1986) 187 Cal.App.3d 575, 580 [231 Cal.Rptr. 725] (*California Trial Lawyers*).) In *California Trial Lawyers*, the court found that the *California Dental* "policy of judicial restraint control[led]" to preclude judicial intervention in interpreting the bylaws of a voluntary association of attorneys that impacted the election of the association's president. (*California Trial Lawyers, supra,* at p. 580.) In so holding, the court explained that "[t]his reluctance to intervene in internecine controversies, the resolution of which requires that an association's constitution, bylaws, or rules be construed, is premised on the principle that the judiciary should generally accede to any interpretation by an independent voluntary organization of its own rules which is not unreasonable or arbitrary." (*Ibid.*)

In this instance, the trial court properly held that it was barred by the abstention doctrine from resolving the dispute between the Raiders and defendants. Ignoring for the moment that the Raiders' breach of fiduciary duty claim is not viable as a matter of law (see pt. III, *ante*), the underlying basis for the claim is not one for an asserted breach of the NFL constitution. The court correctly concluded—after a discussion in its order of each alleged act that the Raiders claimed constituted breaches of fiduciary duty—that the Raiders had not shown any evidence of a violation of a clear and unambiguous provision of the NFL constitution. Indeed, the Raiders admits that its claim is "*not for breach of the NFL's bylaws.*" Further, the Raiders' opposition to defendants' summary adjudication motion presented no facts that demonstrated " ' "an abuse of discretion, and a clear, unreasonable and arbitrary invasion of [the Raiders'] private rights." ' " (*California Dental, supra,* 23 Cal.3d at p. 354.)

In short, the court correctly construed and applied the abstention doctrine of *California Dental.* We observe that the rationale of abstention from intra-association disputes applies with particular force in this instance. Given the unique and specialized nature of this association's business—the operation of a professional football league—there is significant danger that judicial intervention in such disputes will have the undesired and unintended effect of

interfering with the League's autonomy in matters where the NFL and its commissioner have much greater competence and understanding than the courts. We note that other courts have expressed similar unwillingness to intervene in matters that involve the business operations of professional sports organizations. (See *Crouch v. National Ass'n for Stock Car Auto Racing* (2d Cir. 1988) 845 F.2d 397, 403 [court should have declined review of interpretation by stock car racing organization of its own procedural rules in which organization reversed local race track's decision as to victor of stock car race]; *Charles O. Finley & Co., Inc. v. Kuhn* (7th Cir. 1978) 569 F.2d 527, 537–539 [question of whether player assignments were properly disapproved by baseball commissioner as being potentially harmful to the game was given deference by the court because the action was beyond competence of court to decide].)[21] We decline to descend into "the 'dismal swamp' " (*California Dental, supra*, 23 Cal.3d at p. 353) of resolving complex matters involving professional football that are best left to the voluntary unincorporated association that is the NFL.

### V. *The Raiders' Additional Claims*

#### A. *Background and Parties' Contentions*

In its summary adjudication ruling, the court noted that the Raiders' opposition included contentions that Tagliabue "breached fiduciary duties by (1) deliberately depriving [t]he Raiders of its right to participate in League affairs concerning the LTIP [executive compensation program];[22] (2) the Commissioner breached a specific agency relationship with the Raiders associated with the formation of the NFL Enterprises (NFLE); [and] (3) breached control and agency duties by instructing Frank Hawkins to limit the

---

[21] In *Charles O. Finley & Co., Inc. v. Kuhn, supra*, 569 F.2d at pages 532–535, the Seventh Circuit noted that the baseball commissioner (parallel to the NFL commissioner here) had extremely broad authority over the affairs of the professional baseball league. Similar to the kind of standards here—such as the NFL commissioner's right to investigate and punish conduct found to be "detrimental to the welfare of the League or professional football"—the agreement governing the baseball league provided that " 'the functions of the Commissioner shall be . . . to investigate . . . any act, transaction or practice . . . not in the best interests of the national game of Baseball' and 'to determine . . . what preventive, remedial or punitive action is appropriate in the premises, and to take such action . . . .' [Citation.]" (*Id.* at p. 533.) Apropos of our holding that the abstention doctrine applies here, the court in *Finley* stated: "Standards such as the best interests of baseball, the interests of the morale of the players and the honor of the game, or 'sportsmanship which accepts the umpire's decision without complaint,' are not necessarily familiar to courts and obviously require some expertise in their application. While it is true that professional baseball selected as its first Commissioner a federal judge, it intended only him and not the judiciary as a whole to be its umpire and governor." (*Id.* at p. 537, fns. omitted.)

[22] LTIP refers collectively to the "Long Term Incentive Compensation Plan" and accompanying "Supplemental Employee Retirement Plan."

Board of Directors of NFLE to the Broadcast committee of the NFL." The court concluded that these allegations (hereafter, collectively, Additional Claims) had not been pleaded in the second cause of action of the complaint, and thus were not properly before it. The trial court cited *580 Folsom Associates v. Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 18 [272 Cal.Rptr. 227] (*580 Folsom Associates*), in support of this conclusion. It nonetheless held that, even were it to consider the Additional Claims, it would be required to abstain from deciding them, pursuant to *California Dental, supra*, 23 Cal.3d 346.

As part of its postmotion challenge to the summary adjudication ruling, the Raiders requested that, in the alternative to granting its motion for new trial, the Raiders be allowed to amend its complaint to allege the Additional Claims as part of its second cause of action. The proposed amendment would have added a sentence at the beginning of the second cause of action that incorporated by reference each paragraph of the remaining claims of the complaint (the third through 22d causes of action). The court denied the motion to amend, concluding, inter alia, that the Additional Claims would be barred under the *California Dental* abstention doctrine.

The Raiders asserts that these rulings were erroneous for several reasons. In sum, the Raiders argues: (1) the Additional Claims *were* pleaded and properly before the court; (2) even if they were not technically pleaded, the substance of the Additional Claims constituted an immaterial variance from the complaint and should have been considered under Code of Civil Procedure section 470;[23] and (3) the order granting summary adjudication and the denial of the Raiders' motion to amend were both based on the trial court's erroneous conclusion that that the Additional Claims were barred by the *California Dental* abstention doctrine.

Defendants respond with a myriad of assertions. As is relevant to our discussion here, defendants argue that the Additional Claims were not pleaded, and they were, in any event, not viable. As to the latter position, defendants assert that the Additional Claims were without merit because: (1) they were barred (as the trial court found) under the *California Dental* abstention doctrine; (2) the Raiders, as a matter of law, could not assert a claim for breach of fiduciary duty against the NFL or Tagliabue; and (3) they were, in fact, derivative claims that could not be asserted by the Raiders as a

---

[23] "Where the variance is not material, as provided in [Code of Civil Procedure section] 469 the court may direct the fact to be found according to the evidence, or may order an immediate amendment, without costs." (Code Civ. Proc., § 470.) Code of Civil Procedure section 469 reads: "No variance between the allegation in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits. Whenever it appears that a party has been so misled, the Court may order the pleading to be amended, upon such terms as may be just."

direct cause of action for damages. Therefore (defendants argue), the court properly rejected the Additional Claims both at the summary adjudication motion and in the motion to amend because the Additional Claims were not viable.

We conclude that there was no error. The Additional Claims were not properly before the court when it considered the summary adjudication motion and, in any event, the court properly concluded that the Additional Claims were not viable.

### B. *Whether Additional Claims Were Pleaded*

As we have recently reiterated, the pleadings set the boundaries of the issues to be resolved at summary judgment. (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 90 [20 Cal.Rptr.3d 1]; see also *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381 [282 Cal.Rptr. 508].) A "plaintiff cannot bring up new, unpleaded issues in his or her opposing papers. [Citation.]" (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 98–99, fn. 4 [93 Cal.Rptr.2d 820]; see also *Keniston v. American Nat. Ins. Co.* (1973) 31 Cal.App.3d 803, 812 [107 Cal.Rptr. 583] [summary judgment declarations "must be directed to the issues raised by the pleadings"].) A summary judgment or summary adjudication motion that is otherwise sufficient "cannot be successfully resisted by counterdeclarations which create immaterial factual conflicts outside the scope of the pleadings; counterdeclarations are no substitute for amended pleadings." (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1065 [225 Cal.Rptr. 203].) Thus, a plaintiff wishing "to rely upon unpleaded theories to defeat summary judgment" must move to amend the complaint before the hearing. (*Leibert v. Transworld Systems, Inc.* (1995) 32 Cal.App.4th 1693, 1699 [39 Cal.Rptr.2d 65]; see also *580 Folsom Associates, supra,* 223 Cal.App.3d 1, 18.)[24]

In this instance, we readily conclude that the Additional Claims were beyond the scope of the second cause of action of the complaint. Significantly, the second cause of action contains approximately three pages of text alleging specific actions by defendants that the Raiders claims constitute

---

[24] The Raiders argues that it was not required to move to amend its complaint before the hearing on the summary adjudication motion. Any statement to the contrary in *580 Folsom Associates, supra,* 223 Cal.App.3d 1, 18 (the Raiders contends) was dictum and not a correct statement of the law. (See *Kirby v. Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059, 1069 [14 Cal.Rptr.2d 604]; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra,* ¶ 10:22.7, p. 10-7 [*580 Folsom Associates* dictum that motion to amend must be brought before summary judgment hearing "seems incorrect"].) Since the court did not reject the Additional Claims because the Raiders' motion to amend was untimely, we need not resolve this theoretical matter.

breaches of fiduciary duty. Nowhere in that cause of action, however, do we find any reference to an alleged breach of fiduciary duty associated with the LTIP, or to an alleged breach of an agency relationship involving Tagliabue and the Raiders connected with the formation and operation of the NFLE.[25] Therefore, any facts presented in the Raiders' opposition concerning the Additional Claims were properly disregarded in the court's ruling on the summary adjudication motion. (See *Williams v. California Physicians' Service* (1999) 72 Cal.App.4th 722, 738 [85 Cal.Rptr.2d 497] [complaint "measures the scope of issues material to a summary judgment proceeding"].)[26]

### C. *Whether Additional Claims Were Viable*

#### 1. *Application of* California Dental *abstention doctrine*

As noted, the court did not limit its rejection of the Additional Claims to the Raiders' failure to plead them in the second cause of action. Instead, the court determined—assuming arguendo that the Additional Claims were properly before it—that those claims were likewise barred under the abstention doctrine of *California Dental, supra,* 23 Cal.3d 346. We agree with the court's conclusion.

The Raiders' argument on this question is essentially a repetition of its position that the court's application of the abstention doctrine to the second cause of action (*as pleaded*) was an unwarranted extension of *California*

---

[25] We acknowledge that the second cause of action—through its incorporation by reference of all paragraphs of the complaint preceding the breach of fiduciary duty claim—includes paragraphs that generally refer to the LTIP, to the formation of NFLE, and to the NFL Broadcasting Committee. But these incorporated paragraphs contain no reference to Tagliabue's alleged agency relationship with the Raiders or to any alleged breaches of fiduciary duties as identified in the Additional Claims. Thus, we reject the Raiders' assertion that the Additional Claims were included in the second cause of action as a result of the incorporation of these prior, nonspecific paragraphs of the complaint.

[26] We likewise reject the Raiders' claim that the court below should have considered the Additional Claims as an "immaterial variance" from the second cause of action. As we discuss in part V. C. 3, *post,* the Raiders' Additional Claims were derivative rather than direct claims. As such, they could not have been alleged as part of the Raiders' *individual* cause of action for breach of fiduciary duty contained in the second cause of action. The assertion of these *derivative* Additional Claims as *individual* claims would have been an attempt to allege an entirely different cause of action. (See *Fineberg v. Niekerk* (1985) 175 Cal.App.3d 935, 939 [221 Cal.Rptr. 106]; see also Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2005) ¶ 6:598, p. 6-127 [shareholder derivative action and direct suit by shareholder for individual wrong "are mutually exclusive"].) Furthermore, even if the Additional Claims represented an immaterial variance, as the Raiders claims, this is of no consequence: The trial court, despite concluding that the Additional Claims were not pleaded, held also that they were nonetheless barred by the abstention doctrine. Thus, the court in effect treated the Additional Claims as if they were an immaterial variance by considering them on the merits.

*Dental.* This suggests sub silentio that, if the Raiders' main argument concerning *California Dental* is flawed, the trial court was correct in applying the abstention doctrine to bar the Additional Claims. As we have detailed in part IV, *ante,* the Raiders is mistaken in its view that *California Dental* held that the abstention doctrine is limited to disputes involving an association's noncompliance with its own bylaws. The abstention doctrine applies broadly, and the court here properly concluded that it was applicable to the Additional Claims because they involved matters that concerned the internal governance of a private voluntary association, and the disputes did not involve " ' "an abuse of discretion, and a clear, unreasonable and arbitrary invasion of [the party's] private rights." ' [Citation.]" (*California Dental, supra,* 23 Cal.3d at p. 354.)

## 2. *Existence of fiduciary relationship*

We have concluded in part III, *ante,* that no fiduciary relationship between the Raiders and defendants existed as a matter of law. Accordingly, irrespective of whether the claim was based on the allegations of the second cause of action or on the Additional Claims, the Raiders' breach of fiduciary duty claim was not viable. Thus, the court could have properly granted summary adjudication on this basis as well, even after considering the Additional Claims.

## 3. *Derivative or direct claim*

Defendants argue that the Raiders' breach of fiduciary duty cause of action founded on the Additional Claims was also not maintainable because it was a derivative rather than a direct claim. The Raiders (defendants assert) could not bring the Additional Claims as part of an individual cause of action. We conclude that the Additional Claims were derivative in nature.

 As the Supreme Court has explained: "A shareholder's derivative suit seeks to recover for the benefit of the corporation and its whole body of shareholders when injury is caused to the corporation that may not otherwise be redressed because of failure of the corporation to act. Thus, 'the action is derivative, i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets.' [Citations.]" (*Jones, supra,* 1 Cal.3d 93, 106.) In contrast, "a *direct* action [is one] filed by the shareholder individually (or on behalf of a *class* of shareholders to which he or she belongs) for injury to his or her interest as a *shareholder.* . . . [¶] . . . [T]he two actions are mutually exclusive: i.e., the right of action and recovery belongs to either the *shareholders* (direct action)

or the *corporation* (derivative action)." (Friedman, Cal. Practice Guide: Corporations, *supra*, ¶ 6:598, p. 6-127.)

Thus, in *Nelson v. Anderson* (1999) 72 Cal.App.4th 111 [84 Cal.Rptr.2d 753], the minority shareholder alleged that the other shareholder of the corporation negligently managed the business, resulting in its total failure. (*Id.* at p. 125.) The appellate court concluded that the plaintiff could not maintain the suit as a direct action: "Because the gravamen of the complaint is injury to the whole body of its stockholders, it was for the corporation to institute and maintain a remedial action. [Citation.] A derivative action would have been appropriate if its responsible officials had refused or failed to act." (*Id.* at pp. 125–126.) The court went on to note that the damages shown at trial were the loss of corporate profits. (*Id.* at p. 126.) Since "[s]hareholders own neither the property nor the earnings of the corporation," any damages that the plaintiff alleged that resulted from such loss of corporate profits "were incidental to the injury to the corporation." (*Ibid.*)[27]

It is clear in this instance that the Additional Claims—even assuming they were otherwise viable—were derivative in nature. The claim related to the LTIP was that its implementation was "orchestrated" by Tagliabue (among others) and that it was "an unauthorized compensation program" resulting in "millions of dollars in unauthorized payouts to Tagliabue and other NFL executives over the course of several years." The Raiders' own pleading demonstrated that the LTIP obligations—as well as any claimed damages arising from the "unauthorized [LTIP] program"—were those of the NFL and NFL-affiliated companies.

Similarly, the Raiders alleged that the damages related to the formation and operation of the new World League of American Football (through the NFLE) were those of the NFL and NFL-affiliated companies. The alleged wrongful conduct resulted in the "wrongful diversion of NFL revenues belonging to the NFL member clubs to finance the creation and operation of the new World League." The damages were alleged to have been "lost opportunity" damages "in an amount equal to the substantial monetary losses from World League activities."

---

[27] See also *Avikian v. WTC Financial Corp.* (2002) 98 Cal.App.4th 1108, 1115–1116 [120 Cal.Rptr.2d 243] (complaint alleging that officers and directors mismanaged corporation and committed acts of self-dealing was derivative action in which loss of value of shareholders' investments was incidental to harm inflicted on corporation and all of its shareholders); *PacLink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 963 [109 Cal.Rptr.2d 436] (action for fraudulent transfer of assets of limited liability company was derivative, because gravamen of wrong alleged was injury to the company).

Thus, the Additional Claims sought damages as a result of claimed injury to the association (NFL), itself, and to NFL affiliates.[28] Here, "the gravamen of the wrong alleged" (*Nelson v. Anderson, supra,* 72 Cal.App.4th at p. 124) was the mismanagement of the NFL and the resultant diversion of its assets. Any damage to the Raiders caused by contributions made by the NFL and NFL-affiliated entities for LTIP and World League activities was clearly of an incidental nature (i.e., reduction of distributions to the Raiders and all other member clubs). The Additional Claims were plainly derivative and were not maintainable as part of the Raiders' direct action for breach of fiduciary duty.

The court properly determined that the Additional Claims were not viable because the abstention doctrine of *California Dental* applied. As we have seen, the Additional Claims were also not maintainable because of the absence of a fiduciary relationship and because the claims were derivative in nature. Accordingly, since the court correctly held that the proposed Additional Claims were without merit, it properly granted summary adjudication. (See *Mills v. Forestex Co.* (2003) 108 Cal.App.4th 625, 641 [134 Cal.Rptr.2d 273] [court, in granting summary judgment, considered and rejected facts supporting plaintiffs' unpleaded theories of equitable tolling and estoppel, properly concluding that the facts did not support the theories as matter of law].)

### D. *The Motion to Amend*

The court denied the Raiders leave to amend, inter alia, on the ground that the court—just as was the case with the second cause of action *as pleaded*—would be required under *California Dental* to abstain from adjudicating the Additional Claims. Since the court correctly determined that the Additional Claims that the Raiders wished to include in the second cause of action were without merit, it was not required to grant leave to amend; under the circumstances, this would have been an idle act. (*Mills v. Forestex Co., supra,* 108 Cal.App.4th at p. 641 [because unpleaded theories were without merit, plaintiffs "would have gained nothing from the opportunity to amend their complaint"]; *Soderberg v. McKinney* (1996) 44 Cal.App.4th 1760, 1773 [52 Cal.Rptr.2d 635] [leave to amend properly denied where proposed amendment failed to state a cause of action].)

██ Defendants argue further that leave to amend could have been refused because the proposed pleading was a sham. While the court below did not express such reasoning, we agree that it would have been proper to

---

[28] Of course, derivative suits are not limited to actions brought on behalf of corporations; they include derivative actions filed on behalf of unincorporated associations. (See Corp. Code, § 800, subds. (a), (b); *Oakland Raiders, supra,* 93 Cal.App.4th 572, 580.)

deny leave to amend on this basis. "[A] court is not required to accept an amended complaint that is not filed in good faith, is frivolous or sham. [Citation.]" (*American Advertising & Sales Co. v. Mid-Western Transport* (1984) 152 Cal.App.3d 875, 878 [199 Cal.Rptr. 735].) In considering a motion to amend, the court may examine the movant's prior pleading to determine whether the proposed pleading is a sham. (*Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 946 [29 Cal.Rptr.2d 669].) In doing so, the movant must explain inconsistencies between the prior and proposed pleadings. (*Ibid.*) Stated otherwise, " 'a plaintiff may not discard factual allegations of a prior complaint, or avoid them by contradictory averments, in a superseding, amended pleading.' [Citations.]" (*Continental Ins. Co. v. Lexington Ins. Co.* (1997) 55 Cal.App.4th 637, 646 [64 Cal.Rptr.2d 116].)

The proposed amendment here sought to incorporate by reference into the Raiders' second cause of action for breach of fiduciary duty each and every one of the 239 paragraphs of the third through 22d causes of action. This "shotgun" approach notwithstanding, it is readily apparent—from the Raiders' motion for new trial and alternative motion to amend—that the focus of the proposed amendment was the allegations in the fifth, sixth, 10th, and 11th causes of action. The fifth and sixth causes of action concerned alleged mismanagement in the formation and operation of the NFLE and resultant monetary losses from World League activities. The 10th and 11th causes of action claimed breach of fiduciary duty and fraudulent conduct in connection with establishing the LTIP. Significantly, *each of these four causes of action was a derivative claim and was among the claims embraced in the prior appeal.* (See *Oakland Raiders, supra,* 93 Cal.App.4th 572, 579–580.)

Thus, the proposed amendment presented a muddle of contradictory allegations. Through the proposed incorporation of the four derivative causes of action into the *individual* (second) cause of action for breach of fiduciary duty, the Raiders made inconsistent claims. Since derivative and individual claims "are mutually exclusive" (Friedman, Cal. Practice Guide: Corporations, *supra,* ¶ 6:598, p. 6-127), the Raiders could not allege that the claims it previously asserted were derivative had inexplicably become direct claims.

Moreover, to the extent that the Raiders' proposed amendment sought to incorporate into the second cause of action the four derivative claims mentioned, this court has previously decided those claims. We affirmed the court's prior summary adjudication of those claims in a manner adverse to the Raiders on the grounds that (1) the *California Dental* abstention doctrine applied, and (2) the Raiders made no factual showing that it was exempt from making demand upon the NFL's governing board as a prerequisite to initiating the derivative claims. (See *Oakland Raiders, supra,* 93 Cal.App.4th

at pp. 581–592.) The prior decision of this court is law of the case. (*Clemente v. State of California* (1985) 40 Cal.3d 202, 211–212 [219 Cal.Rptr. 445, 707 P.2d 818]; *De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 906 [114 Cal.Rptr.2d 708].)

We conclude that the trial court properly rejected the Additional Claims, both because they were not pleaded, and because they were without merit as a matter of law. Summary adjudication was thus proper and the court did not abuse its discretion by denying leave to amend. (See *Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 44 [96 Cal.Rptr.2d 354] [denial of leave to amend was not abuse of discretion where movant could not show viability of new claims].)[29]

## DISPOSITION

There were no triable issues of material fact concerning the second cause of action for breach of fiduciary duty. Accordingly, the court properly granted defendants' summary adjudication motion. The judgment is affirmed.

Rushing, P. J., and Elia, J., concurred.

**RUSHING, P. J.,** Concurring.—The Raiders *are* a diverse group of athletes. But despite such pluralism, the Raiders *is* a singular football team, and because of this, I must concur in the technical propriety of such phrases as "the Raiders asserts," "the Raiders does not contend," and "the Raiders was discriminated against," which appear in the main opinion. However, although these phrases may be sound, their sound, to me, is personally foul and deserves dissent, if not a 15-yard penalty and loss of down. This is especially so when the phrases are read out loud.

I have long been a loyal fan of grammatical agreement. The natural harmony between subject and verb is usually euphonious. But my boosterism has not deafened me. Though the merits of agreement may be great, here it is grating. The phrases noted above are like blasts from an air horn or plastic trumpet, blaring technical correctness.

---

[29] Defendants assert several additional arguments in support of their positions that the Additional Claims were not maintainable and that the motion to amend was properly denied, including the claim that the motion by the Raiders was untimely. We need not address these additional questions, since we have concluded that the court's rejection of the Additional Claims was otherwise proper.

Obviously, with a subject like "the Raiders," the writer enters the challenging zone of subject-verb agreement. And in this appellate opinion, I do not think we should have simply agreed to "disagreement." However, I believe we could have reached our goal of meaning and avoided fumbling dissonance with a judicial substitution: pulling "the Raiders" and going with a second-stringer like "the plaintiff."